UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- x
PHYTO TECH CORP. d/b/a BLUE CALIFORNIA, and  :
CONAGEN INC.,                                :
                                             :    18-CV-06172 (JGK)
                       Plaintiff,            :
                                             :
v.                                           :
                                             :
GIVAUDAN SA                                  :
                                             :
                       Defendants.           :
                                             :
------------------------------------------------- x

**PHYTO TECH CORP. D/B/A BLUE CALIFORNIA, AND CONAGEN INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Phyto Tech Corp. d/b/a Blue California ("Blue Cal') and Conagen Inc. ("Conagen") (collectively "Plaintiffs") respectfully submits this Proposed Findings of Fact and Conclusions of Law. The following statements are meant to serve as an overview of the facts to be litigated at trial. Accordingly, Plaintiffs reserve the right to prove additional details regarding the below facts that have been identified throughout the discovery process. Plaintiffs further intend to offer evidence to rebut evidence offered by Defendant.

## FINDINGS OF FACT

### I.  THE PARTIES AND RELEVANT INDIVIDUALS

1. Plaintiff Blue Cal is a California corporation with a principal place of business at 30111 Tomas, Rancho Santa Margarita, California 92688. Blue Cal is in the business of manufacturing natural ingredients, as well as related research and development.

2. Plaintiff Conagen is a Massachusetts corporation with a principal place of business at 13-15 Deangelo Drive, Bedford, Massachusetts 01730. Conagen is in the business of

1

researching and developing bio-manufacturing processes and techniques, including work to identify organisms and biosynthetic pathways to produce materials of interest.

3. Blue Cal and Conagen are world leaders in the field of synthetic biology, which involves, amongst other things, the creation of flavors and fragrances using genetically engineered microorganisms.

4. Steven Chen is the current president of both Blue Cal and Conagen and has held those positions from since the companies' respective foundings.

5. Dr. Oliver Yu co-founded Conagen with Mr. Chen and is its CEO.

6. Defendant Givaudan SA ("Givaudan") is a company organized under the laws of Switzerland. Givaudan is a manufacturer of flavors, fragrances, and active cosmetic ingredients. Its principal place of business is located at 5, Chemin de la Parfumerie, 1214 Vernier, Switzerland.

7. Juerg Witmer is the former chairman of Givaudan and retired in March of 2017.

8. Christiaan Thoen is the former Head of Science and Technology for the Flavor Division of Givaudan. Mr. Thoen served in that position from June 2011 to October 2015. After October 2015, Mr. Thoen became a member of Givaudan's Executive Board and took the role of Chief Technology Officer across Givaudan's flavors, fragrances, and active beauty divisions until his retirement in September 2018.

## II. THE BGN TECH LLC JOINT VENTURE

9. In about 2010, Givaudan first contacted Blue Cal to ask about ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

10. Givaudan was impressed with Blue Cal's capabilities. The parties began to discuss possible research and development collaborations on other compounds that could prove fruitful for both companies.

11. On February 21, 2014, Blue Cal and Givaudan entered into an agreement, the Limited Liability Company Agreement of BGN Tech LLC (the "BGN LLC Agreement"). This agreement formed a new entity: BGN Tech LLC ("BGN"). BGN was formed as a joint venture between Blue Cal and Givaudan for the express purpose of developing, manufacturing, marketing, and selling certain ingredients.

12. In order to protect the intellectual property rights of the parties and their affiliated companies, the BGN LLC Agreement included comprehensive confidentiality provisions.

13. The BGN Agreement defines the term "Trade Secret" to mean "any and all technical and operational information, including product formulae, customer lists, marketing strategies, cost and price information, processes, management methods and production methods, in each case which is (i) not generally known to the public, (ii) which has economic value or provides a competitive advantage and/or (iii) which the owner has taken measures to keep secret."

14. The BGN Agreement contains a provision titled "Section 12.01 Confidentiality" ("Confidentiality Provision").

15. Subsection (a) of the Confidentiality Provision states as follows:

> Each of the Members acknowledges that, from time to time, it and its Affiliates may receive information from or regarding the other Member (or its Affiliates) or the Company in the nature of trade secrets or that otherwise is confidential, including the terms of this Agreement and any Company Products ("Confidential Information"), the release or disclosure of which could be damaging to the other Member (or its Affiliates), the Company or Persons with which it does business.

16. Subsection (b) of the Confidentiality Provision states as follows:

> Each of the Members and the Company receiving any Confidential Information (each, a "Receiving Party") shall hold in strict confidence any Confidential Information it receives with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature, but in no event less than a reasonable degree of care; provided, that a Receiving Party may disclose such Confidential Information to any Affiliate, Covered Person or professional advisor of such Receiving Party that agrees to abide by the restrictions in this Section 12.01; provided, further, that a Receiving Party may disclose such Confidential Information to the extent required by any legal, accounting or regulatory requirements (including the requirements of any securities exchange) or in connection with enforcing its rights under this Agreement or the Ancillary Agreements; and provided, further, that the Receiving Party disclosing such Confidential Information shall be responsible for any breaches of confidentiality by any such Affiliate, Covered Person or professional advisor of such Receiving Party. For the avoidance of doubt, the restrictions in this Section 12.01(b) shall continue to apply to a Member after it has ceased to be a Member.

17. Subsection (c) of the Confidentiality Provision states as follows:

> The restrictions in this Section 12.01 shall not apply to any Confidential Information to which the Receiving Party can demonstrate that such Confidential Information: (i) is or became public knowledge through no action of such Receiving Party or its Affiliates, officers, directors, representatives or agents in violation of this Agreement; (ii) has been provided to such Receiving Party without restriction by an independent third party who has not, directly or indirectly, received such Confidential Information from such Receiving Party (or the Company); (iii) was properly in the possession of such Receiving Party prior to the time of receipt of such Confidential Information; (iv) is required to be disclosed by law, regulation or court order (provided, that such Receiving Party shall notify the Board promptly of any request for that Confidential Information, before disclosing it if practicable); (v) was developed independently by such Receiving Party in the course of work by employees or other agents of such Receiving Party without use of such Confidential Information; or (vi) has been provided to such Receiving Party independently of such Receiving Party's activities with respect to the Company.

18. The BGN Board of Directors consisted of five individuals: Mr. Chen, Mr. Yu, Byron Olsen, all of whom were all affiliated with Blue Cal and/or Conagen, and Christiaan Thoen and William Marino, who were affiliated with Givaudan.

19. After Givaudan and Blue Cal executed the BGN LLC Agreement, representatives of each of the members met in Cincinnati, Ohio on March 25 and March 26, 2014 to discuss next

4

steps for the joint venture.  The presentation prepared for the meeting ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

20. The presentation provided ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

21. The presentation discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

22. The presentation also stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

## III.   THE ▮▮▮▮▮▮▮▮▮▮▮▮ PROJECT

23. One aspect of BGN's business was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

24. In September 2014, representatives of Givaudan and Blue Cal met to discuss

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

25. ▮▮▮▮▮ This meeting including discussions related to questions of ▮▮▮▮▮ and were considered highly confidential.

26. A decision by BGN to ▮▮▮▮▮ was considered by both Givaudan and Blue Cal to be confidential information. In particular, ▮▮▮▮▮ was confidential information.

27. At the September 2014 meeting, the parties discussed ▮▮▮▮▮ The parties understood that this was subject to change in the future.

IV. **GIVUADAN** ▮▮▮▮▮

28. In January 2016, knowing that ▮▮▮▮▮ Givaudan sent a memorandum to ▮▮▮▮▮

29. Givaudan did not inform BGN, Blue Cal, or Conagen that ▮▮▮▮▮

30. Givaudan provided ▮▮▮▮▮

31. Givaudan and Blue Cal representatives held a meeting May 2016, for which Givaudan prepared a slide presentation titled ▮▮▮▮▮ This presentation included a slide referring to ▮▮▮▮▮ Givaudan used a

6

code name so as not to reveal the fact that t▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

32.  Givaudan and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ At that time, Givaudan did not inform BGN, Blue Cal, or Conagen of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

33.  Givaudan knew that ▮▮▮ was a competitor to BGN and Blue Cal. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

34.  In a November 2016 meeting of the BGN board of directors, Givaudan

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

35.  At that meeting, the presentation created by Givaudan included ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

36.  Givaudan also presented ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

37. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38. The profit margin in the field of synthetic biology generally ranges from 20% to 30%, depending on the difficulty of the project.

39. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## V. GIVUADAN SHARES TRADE SECRET INFORMATION WITH ▮▮▮▮▮

40. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

41. In mid-2017, Givaudan approached Blue Cal and Conagen to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

42. On or about June 23, 2017, Conagen and Givaudan entered into a "Mutual Confidentiality Agreement," which stated, among other things: "Each Party intends to disclose certain Confidential Information (defined below) for the purposes of evaluating business opportunities and engaging in a business relationship related to the scale-up and manufacturing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the 'Purpose')."

43. After signing the Mutual Confidentiality Agreement in June 2017, Conagen entered into talks with Givaudan relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As part of those talks, Conagen provided to Givaudan information related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

44.   ██████████████████ was secret, and Givaudan was well aware that █████

████████████████████████████████ was a breach of its obligations.  █████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████

45.   Specifically, Conagen disclosed to Givaudan ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Conagen also disclosed to Givaudan █

███████████████████████████████████████████████████████

9

██████████████████████████████████████████████████████████████████████████████

█████████████████████████████

46. Conagen also █████████████████████████████████████████████████████

█████

47. Conagen considered ████████████████████████████████████ to be highly confidential.

48. This information was valuable to Conagen. ██████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████

49. Conagen keeps all of this information strictly confidential, and it was disclosed to Givaudan under the confidentiality agreements signed by the parties.

50. Indeed, Conagen has implemented numerous physical security measures to ensure that ████████████████████████ are kept secret, including ████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████

51. At the time that Conagen disclosed this information to Givaudan, the information was not commonly known and could not be obtained without ▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰.

52. Givaudan disclosed this highly confidential information to ▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰.

53. For example, ▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰.

54. ▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰

55. Givaudan neither sought nor obtained Conagen's prior written consent before disclosing this information. Conagen never provided consent to Givaudan to disclose *any* of this highly proprietary information to any third party.

## CONCLUSIONS OF LAW

### I.      COUNT I – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF 18 U.S.C. § 1836(b)

56. To establish a claim for trade secret misappropriation under the DTSA, Plaintiffs must show (1) the existence of a trade secret, and (2) the defendant's misappropriation of that trade secret. 18 U.S.C. § 1836(b)(1).

57. The DTSA defines a trade secret as: "all forms and types of financial, business, scientific, technical, economic, or engineering information…if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3).

58. The following constitute the trade secrets of Blue Cal and Conagen: ███
███
███
███

59. The information ███
███ is "scientific, technical…or engineering information" that qualifies for trade secret protection.

60. Conagen took reasonable measures to keep this information secret. ███
███
███
███
███
███

61. Conagen took the additional step of signing a Mutual Confidentiality Agremeent with Givaudan to protect this information from disclosure.

62. At the time that Conagen disclosed this information to Givaudan, the information was not commonly known and could not be obtained ███

████████████████████████████████████████████████████████

████████████████████████████████

63.     This information derives independent economic value from not being generally known. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

64.     This information was disclosed to Givaudan under the Mutual Confidentiality Agreement signed by both parties.  This Mutual Confidentiality Agreement created a duty on Givaudan's part to keep this information confidential.  Givaudan also owed a duty of confidentiality to the Blue Cal Group and Conagen under the BGN LLC Agreement.

65.     Givaudan misappropriated this trade secret information by ████████████ while under a duty to keep it confidential.

66.     Specifically, Givaudan disclosed this information ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

67. In addition, t█████████████████████████████████████ █████████████ is also the type of "scientific, technical…or engineering information" that qualifies for trade secret protection.

68. Givaudan confirmed that █████████████████████████████████ ████████ would be confidential information. Givaudan also confirmed that ██████████ ███████████████████████████████████████████████ would be confidential.

69. Plaintiffs took reasonable measures to keep this information secret. In particular, the BGN LLC Agreement contains confidentiality provisions that protect this information.

70. This information was not commonly known and could not be obtained from outside of BGN. The information derives independent economic value from not being generally known.

71. This information was disclosed to Givaudan under the BGN LLC Agreement signed by both Givaudan and Blue Cal. The BGN LLC Agreement created a duty on Givaudan's part to keep this information confidential.

72. Givaudan misappropriated this trade secret information by ████████████████ while under a duty to keep it confidential.

73. Plaintiffs have been damaged by this misappropriation of Plaintiffs trade secrets.

74. Plaintiffs are entitled to the recovery of lost profits on ████████████████████ Lost profits are calculated by reference to the "but for" world in which Givaudan complied with the BGN LLC Agreement and its obligations, rather than using and disclosing Plaintiffs' confidential information ███████████████████████████████████.

75. In the "but for" world, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

76. Givaudan projected that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

77. BGN would have ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

78. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

79. It is reasonable to assume that the parties would have reached a similar arrangement for ▬▬▬▬▬▬ and arranged their affairs so that BGN ▬▬▬▬▬▬▬▬▬▬

▬▬▬▬

80. Accordingly, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

81. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

██████████████████████████████████████████████████████████████████

████████████████████████████████

82.   ████████████████████████████████████████████████████████████

████████████████████████████████

83.   ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

84.   A███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

85.     Givaudan's misappropriation was willful. Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) are warranted in an amount of two times the amount of compensatory damages.

86.     Plaintiffs are also entitled to an award of interest, costs, fees, and other expenses associated with this action, including reasonable attorneys fees, to be calculated.

## II.   COUNT II – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF 6 DEL. C. CH. 20

87.     To establish a claim for trade secret misappropriation under the DUTSA, Plaintiffs must show that "(1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *iBio, Inc. v. Fraunhofer USA, Inc.*, C.A. No. 10256-VCF, 2020 WL 5745541, at *6 (Del. Ch. Sept. 25, 2020).

88.     The DUTSA defines a trade secret as: "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (A) Derives independent

16

economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  6 Del. C. § 2001.

89. The following constitute the trade secrets of Blue Cal and Conagen: ▮



90. For the same reasons discussed above (¶¶ 59-71), Givaudan committed misappropriation of trade secret information under the DUTSA by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

91. Plaintiffs have been damaged by this misappropriation of Plaintiffs trade secrets.

92. Damages are due ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the reasons outlined in Paragraphs 74 through 84 above.

93. Givaudan's misappropriation was willful.  Exemplary damages under 6 De. C. § 2003(b) are warranted in an amount of two times the amount of compensatory damages.

94. Plaintiffs are also entitled to an award of interest, costs, fees, and other expenses associated with this action, including reasonable attorneys fees, to be calculated.

### III.   COUNT III – BREACH OF CONTRACT

95. To establish a breach of contract claim, Plaintiffs must show three elements: (1) the existence of a contract, (2) breach, and (3) resulting damages. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

96. The BGN LLC Agreement is a contract, signed by both Blue Cal and Givaudan.

97. The BGN LLC Agreement includes comprehensive confidentiality provisions. In particular, The BGN Agreement contains a provision titled "Section 12.01 Confidentiality" ("Confidentiality Provision").

98. Subsection (a) of the Confidentiality Provision states as follows:

Each of the Members acknowledges that, from time to time, it and its Affiliates may receive information from or regarding the other Member (or its Affiliates) or the Company in the nature of trade secrets or that otherwise is confidential, including the terms of this Agreement and any Company Products ("Confidential Information"), the release or disclosure of which could be damaging to the other Member (or its Affiliates), the Company or Persons with which it does business.

99. Subsection (b) of the Confidentiality Provision states as follows:

Each of the Members and the Company receiving any Confidential Information (each, a "Receiving Party") shall hold in strict confidence any Confidential Information it receives with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature, but in no event less than a reasonable degree of care; provided, that a Receiving Party may disclose such Confidential Information to any Affiliate, Covered Person or professional advisor of such Receiving Party that agrees to abide by the restrictions in this Section 12.01; provided, further, that a Receiving Party may disclose such Confidential Information to the extent required by any legal, accounting or regulatory requirements (including the requirements of any securities exchange) or in connection with enforcing its rights under this Agreement or the Ancillary Agreements; and provided, further, that the Receiving Party disclosing such Confidential Information shall be responsible for any breaches of confidentiality by any such Affiliate, Covered Person or professional advisor of such Receiving Party. For the avoidance of doubt, the restrictions in this Section 12.01(b) shall continue to apply to a Member after it has ceased to be a Member.

100. Subsection (c) of the Confidentiality Provision states as follows:

The restrictions in this Section 12.01 shall not apply to any Confidential Information to which the Receiving Party can demonstrate that such Confidential Information: (i) is or became public knowledge through no action of such Receiving Party or its Affiliates, officers, directors, representatives or agents in violation of this Agreement; (ii) has been provided to such Receiving Party without restriction by an independent third party who has not, directly or indirectly, received such Confidential Information from such Receiving Party (or the Company); (iii) was properly in the possession of such Receiving Party prior to the time of receipt of such Confidential Information; (iv) is required to be disclosed by law, regulation or court order (provided, that such Receiving Party

shall notify the Board promptly of any request for that Confidential Information, before disclosing it if practicable); (v) was developed independently by such Receiving Party in the course of work by employees or other agents of such Receiving Party without use of such Confidential Information; or (vi) has been provided to such Receiving Party independently of such Receiving Party's activities with respect to the Company.

101. Givaudan's disclosure of information ███████████████████ breached the Confidentiality Provision of the BGN LLC Agreement and related 2017 Mutual Confidentiality Agreement.

102. Neither Blue Cal nor Conagen consented to the disclosure of ███████ ██████████████████.

103. Plaintiffs have been damaged by Givaudan's breach.

104. Damages are due ███████████████, for the reasons outlined in Paragraphs 74 through 84 above.

105. Plaintiffs are also entitled to an award of interest, costs, fees, and other expenses associated with this action, including reasonable attorneys fees, to be calculated.

Dated: April 29, 2022

                                    Respectfully submitted,

                                    By:   */s/ Martin J. Black*

                                          Katherine A. Helm
                                          DECHERT LLP
                                          Three Bryant Park
                                          1095 Avenue of the Americas
                                          New York, New York 10036
                                          Tel. (212) 698-3500
                                          khelm@dechert.com

                                          Martin J. Black (pro hac vice)
                                          Cira Centre
                                          2929 Arch Street
                                          Philadelphia, PA 19104
                                          Tel. (215) 994-4000
                                          martin.black@dechert.com

                                          *Attorneys for Phyto Tech Corp. and Conagen Inc.*