UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PHYTO TECH CORP. d/b/a BLUE
CALIFORNIA, and CONAGEN INC.

                    Plaintiffs,

      v.

GIVAUDAN SA,

                Defendant.
_____

Civil Action No. 18-cv-06172 (JGK)


**<u>DEFENDANT GIVAUDAN SA'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW</u>**


GOLDBERG SEGALLA LLP

Christopher J. Belter
Ryan G. Pitman
*Attorneys for Plaintiff
Givaudan SA*
665 Main Street
Buffalo, New York 14203-1425
Phone: 716.566.5400
Fax:    716.566.5401
cbelter@goldbergsegalla.com
rpitman@goldbergsegalla.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

FINDINGS OF FACT............................................................................................................. 1

   I.    Undisputed Findings of Fact ................................................................... 1

   II.   Givaudan's Proposed Additional Findings of Fact ................................ 5

         A. The Parties' Respective Roles in the Green Note 1 Biomanufacturing Project .......... 5

         B. Plaintiffs' Purported Trade Secret Information ............................... 9

         C. The Termination of the Green Note 1 Project .............................. 11

         D. Plaintiffs' Statement of Damages ................................................ 12

CONCLUSIONS OF LAW ................................................................................................. 13

   I.    Standards for Demonstrating the Existence of a Trade Secret ....................................... 13

   II.   Misappropriation and Measure of Damages ................................................. 15

   III.  Plaintiffs Have Not Demonstrated the Existence of Any Trade Secret ......................... 17

   IV.  Plaintiffs Have Not Demonstrated Any Damages "Caused by" Givaudan's Alleged Misappropriation ........................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AirFacts, Inc. v. De Amezaga*,
　909 F.3d 84 (4th Cir. 2018) ...................................................................................14

*In re Avaya Inc.*,
　No. 17-10089 (SMB), 2018 Bankr. LEXIS 1209 (Bankr. S.D.N.Y. Apr. 23,
　2018) ........................................................................................................................17

*Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.*,
　1 F. Supp. 3d 224 (S.D.N.Y. 2014) ........................................................................14

*Chartis Warranty Guard, Inc. v. Nat'l Elecs. Warranty, LLC*,
　No. 5764-VCP, 2011 Del. Ch. LEXIS 28 (Ch. Jan. 28, 2011) ...............................16

*Duphily v. Del. Elec. Coop., Inc.*,
　662 A.2d 821 (Del. 1995) .......................................................................................17

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs.*,
　893 F.3d 1176 (9th Cir. 2018) ...............................................................................15

*Firetrace USA LLC v. Jesclard*,
　800 F.Supp.2d 1042 (D. Ariz. 2010) ......................................................................21

*Franklin Interiors, Inc. v. Wesolosky*,
　No. 20cv1423, 2020 U.S. Dist. LEXIS 249035 (W.D. Pa. Oct. 21, 2020)..............16

*Heska Corp. v. Qorvo US, Inc.*,
　No. 1:19CV1108, 2020 U.S. Dist. LEXIS 180337 (M.D.N.C. Sep. 30, 2020) .......15

*Kuroda v. SPJS Holdings*,
　L.L.C., 971 A.2d 872 (Del. Ch. 2009) ..................................................................22

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
　342 F.3d 714 (7th Cir. 2003) .................................................................................13

*Linkco, Inc. v. Fujitsu Ltd.*,
　232 F. Supp. 2d 182 (S.D.N.Y. 2002)......................................................................17

*Medidata Sols., Inc. v. Veeva Sys.*,
　2018 U.S. Dist. LEXIS 199763 (S.D.N.Y. Nov. 26, 2018)....................................15

*Metallurgical Indus. v. Fourtek, Inc.*,
　790 F.2d 1195 (5th Cir. 1986) ...............................................................................16

*Nucar Consulting, Inc. v. Doyle*,
    Civil Action No. 19756-NC, 2005 Del. Ch. LEXIS 43 (Ch. Apr. 5, 2005) ...........................13

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
    No. 11-CV-00726 (CBA) (RLM), 2014 U.S. Dist. LEXIS 200610 (E.D.N.Y.
    Sep. 17, 2014) ....................................................................................................................17

*R.F.M.A.S., Inc. v. Mimi So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)................................................................................17

*RLM Communs. V. Tuschen*,
    66 F.Supp.3d 681 (E.D.N.C. 2014)....................................................................................21

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986, 104 S. Ct. 2862 (1984)................................................................................15

*Savor, Inc. v. FMR Corp.*,
    No. 00C-10-249-JRS, 2004 Del. Super. LEXIS 276 (Super. Ct. July 15, 2004)....................14

*SI Handling Sys. v. Heisley*,
    753 F.2d 1244 (3d Cir. 1985)............................................................................................14

*Sit-Up Ltd. v. IAC/InterActiveCorp.*,
    2008 U.S. Dist. LEXIS 12017 (S.D.N.Y. Feb. 20, 2008)........................................................14

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
    Civil Action No. 04-3623 (WHW), 2008 U.S. Dist. LEXIS 35364 (D.N.J.
    Apr. 30, 2008) ............................................................................................................20, 21

*Tank Connection LLC v. Haight*,
    161 F.Supp.3d 957 (D. Kan. 2014)....................................................................................22

*Total Care Physicians, P.A. v. O'Hara*,
    No. 99C-11-201 JRS, 2003 Del. Super. LEXIS 261 (Super. Ct. July 10, 2003)....................16

*Vention Med. Advanced Components, Inc. v. Pappas*,
    No. 217-2014-CV-604, 2016 N.H. Super. LEXIS 13 (Sep. 7, 2016)......................................15

**Statutes**

6 Del. C. § 2001(2) .............................................................................................................16

6 Del. C. § 2001(4) .............................................................................................................13

18 U.S.C. § 1839(3)(A)-(B)..................................................................................................13

18 U.S.C. § 1839(b)(3)(B)....................................................................................................16

Del. Code Ann. tit. 6, § 2003 ..............................................................................................16

Delaware Uniform Trade Secrets Act ............................................................................................... 13

DTSA ....................................................................................................................... 13, 14, 16, 17, 22

DUTSA .......................................................................................................................... 13, 14, 16, 22

## INTRODUCTION

Defendant Givaudan SA, by and through its attorneys, Goldberg Segalla LLP, submits these Proposed Findings of Fact and Conclusions of Law pursuant to the Court's individual practices and orders of July 30, 2021, October 14, 2021, and February 7, 2022 in advance of the bench trial scheduled to commence June 6, 2022.

## FINDINGS OF FACT

### I.   Undisputed Findings of Fact

For the sake of context and completeness, Givaudan SA recites the following undisputed facts as determined by the Court in rendering its decision at the summary judgment phase:

1.      Plaintiff Phyto Tech Corp. d/b/a Blue California ("Blue Cal"), a California corporation with a principal place of business in California, is in the business of research, development, and manufacturing of natural ingredients.

2.      Plaintiff Conagen Inc. ("Conagen") focuses on discovery and commercialization of materials through organic and biosynthetic pathways.

3.      Steven Chen has been president at both Blue Cal and Conagen since their founding. Dr. Oliver Yu co-founded Conagen with Chen and is its Chief Executive Office.

4.      Defendant Givaudan SA, a Swiss corporation, (hereinafter together with its affiliates, "Givaudan") sells flavors and fragrances to industry customers for use.

5.      On February 21, 2014, Blue Cal and Givaudan entered into a joint venture named BGN Tech LLC ("BGN") for the purpose of developing, manufacturing, marketing, and sales of certain ingredients pursuant to a Limited Liability Company Agreement (the "LLC Agreement").

6.      The BGN Board of Directors was composed of three Blue Cal/Conagen representatives and two Givaudan representatives, one of whom was Christian Thoen, who at the time was Head of Science and Technology for the Flavors Division of Givaudan.

7.     The LLC Agreement provided for Givaudan to contribute capital and certain intellectual property ("IP") and for Blue Cal to contribute IP concerning three ingredients.

8.     The LLC Agreement defined the term "Trade Secret" as "any and all technical and operational information, including product formulae, customer lists, marketing strategies, cost and price information, processes, management methods and production methods, in each case which is (i) not generally known to the public, (ii) which has economic value or provides a competitive advantage and/or (iii) which the owner has taken measures to keep secret."

9.     The LLC Agreement also contained a confidentiality provision that required the parties to keep confidential any information "from or regarding the other Member (or its Affiliates) or the Company in the nature of trade secrets or that otherwise is confidential . . . ('Confidential Information'), the release or disclosure of which could be damaging to the other Member (or its Affiliates)."

10.    In September 2014, Givaudan and Blue Cal met to discuss the list of ingredients of interest to Givaudan, known as the "wish list," which included ███████████████ ████████. The parties agreed to deprioritize ████████.

11.    The December 2015 BGN board meeting presentation did not include ████████ in the list of key initiatives.

12.    In or about January 2016, Givaudan met with ██████████████████ to discuss potential partnerships.

13.    In May 2016, Givaudan disclosed to Blue Cal a potential collaboration with an undisclosed party on an undisclosed project that, if the technology was successful, could use the capabilities of Blue Cal's affiliate(s) for scale-up and manufacturing.

14.     On August 3, 2016, Givaudan and ██████ entered into a "Collaboration and License Agreement" pursuant to which ██████ was to identify a biosynthetic pathway to produce ████████.

15.     In a November 2016 meeting, Givaudan and Blue Cal representatives again discussed the third party collaboration that, if the technology was successful, could use the capabilities of Blue Cal's affiliate(s) for scale-up and manufacturing, codenamed "Green Note 1," and Givaudan presented five-year financial projections for the project.

16.     On or about June 23, 2017, Conagen and Givaudan entered into a "Mutual Confidentiality Agreement," which stated that the parties "intend[] to disclose certain Confidential Information . . . for the purposes of evaluating business opportunities and engaging in a business relationship related to the scale-up and manufacturing of ████████ ████████."

17.     On June 30, 2017, Thomas Kirsch, Director of External Collaboration for Givaudan, emailed Yu stating, "[w]e are looking forward to engaging with Conagen on this project to rapidly commercialize ████████ as a raw material for Givaudan."

18.     On July 5, 2017, Chen emailed Yu instructing him to "prepare a R/D proposal on this project."

19.     According to Conagen, after signing the confidentiality agreement, Conagen provided to Givaudan information related to Conagen's capabilities, capacities, production facilities, and production methods.

20.     Conagen contends it specifically disclosed information relating to ████████ ████, including specifically: ████████████████████████ ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████.

21.      On July 10, 2017, Chen emailed the BGN board members referring to a call from Kirsch to Yu in which Kirsch told Yu that the name of the third-party partner on "Green Note 1" was ████. In that email, Chen characterized this news as "disturbing" and "shocking" and stated that "[t]he happy marriage of BGN suddenly seems like the movie 'Sleeping with the Enemy[.]'" Chen also attached a draft board resolution in which BGN would agree to contract with a new partner to conduct the research and development for Green Note 1 that ████ was already working on in collaboration with Givaudan.

22.      In his response, Thoen "point[ed] out that it has been communicated to BGN all along that Givaudan is working with a third party on the ██████████ for Green Note 1" and voted "no" on the board resolution.

23.      Despite these disagreements, Givaudan and Conagen proceeded with plans to have Conagen perform further development, scale-up, and manufacturing of Green Note 1. In January 2018, Conagen submitted a "Technology Transfer and Scale Up Proposal" to Givaudan, and thereafter, some further communications on this project occurred, but ultimately, the scale-up work never materialized and disputes among the parties escalated.

4

24.     The plaintiffs initially alleged that Givaudan disclosed Conagen's trade secrets to a competitor of BGN without Conagen's consent with respect to three categories of compounds: ███████████████████████. In the briefing on the motion for summary judgment, and at the argument, plaintiffs dropped their arguments with respect to ███████████████, but maintain that Givaudan improperly disclosed to ██████ confidential trade secrets information relating to ████████.

25.     The plaintiffs point to various email communication between Givaudan and ██████ from January 11, 2018 to February 4, 2018, which they allege reflects sharing of Conagen's trade secrets. The email exchange also shows that █████ representatives questioned the Givaudan representatives about Blue Cal's capabilities, ███████████████████████████ ████████████████ and that Givaudan provided █████ some of the information and stated that it would obtain the remaining information from Conagen. But, information with respect to whether that information was obtained or provided to █████ was left unresolved.

26.     With respect to damages, the plaintiffs rely on the financial projections for the ████████ project provided by Givaudan, as well as the lost R&D funding and production opportunities lost to competitors as an alleged result of the alleged improper disclosures by Givaudan. The plaintiffs additionally support their damages calculations with profit estimates based on similar projects, and, in the alternative, a calculation of a reasonable royalty and the unjust enrichment derived by Givaudan.

## II.     Givaudan's Proposed Additional Findings of Fact

### A.     The Parties' Respective Roles in the Green Note 1 Biomanufacturing Project

27.     In general terms, biosynthetic manufacturing (or biomanufacturing) of the sort involved in this case consists of (1) engineering a microorganism capable of producing a target

5

compound by its metabolic functions; (2) developing a process to breed that microorganism in a succession of vessels of increasing volume, starting at the volume of a laboratory vial and culminating in a commercial manufacturing volume on the order of tens of thousands of liters, with each step generally representing an increase in volume by an order of magnitude; and (3) isolating the resulting target compound to obtain a salable product for use in industry. The exercise of developing a biomanufacturing process from smaller scales up to the commercial manufacturing scale is known as "scale up."

28.    This process involves optimization of control parameters that affect the environment in which the microorganism lives along with its metabolic and reproductive functions. These include such aspects as dissolved oxygen, temperature, pH, feeding (in terms of what compounds the microorganism is fed, as well as the pace and concentration at which it is fed), how components are added to the microorganism's environment, and the effects of physical forces on the microorganism when transferring from smaller vessels to larger vessels.

29.    The optimal configuration of such factors at a smaller scale may not be the same as the optimal configuration of such factors at larger scales, as the volume of the medium in which the microorganism lives can have qualitative effects on the control factors described above. For example, transferring a large volume of fluid to an even larger vessel introduces more significant turbulence and shear forces, which can affect the microorganism, than transferring a smaller volume of liquid.

30.    For these reasons, development of biomanufacturing processes requires evaluation and adjustment of these control factors at each volumetric stage in order to achieve a viable process.

31.     The general goal of commercial biomanufacturing is to produce sufficient volumes of the target compound at sufficient levels of purity in as short a time as possible, and with as little overhead cost as possible. One corollary of this goal is that it is generally desirable to develop a process that includes fewer transfers between vessels of increasing volume. The reason for this general industry preference is that transferring between vessels requires overhead cost and introduces the risk of contamination.

32.     Givaudan uses ███████ as a precursor to ingredients it uses in various flavors it sells. Givaudan was interested in developing a new process to biomanufacture ███████ because it had just one source from which to purchase ███████. Givaudan wished to develop a more cost-effective process but also to avoid being limited to a single source as a matter of supply chain resiliency and business continuity.

33.     Givaudan contemplated that each of itself, █████ and Conagen would perform discrete roles within their respective areas of expertise and focus.

34.     Givaudan contemplated that █████ would perform ████████████ In other words, █████ would ███████████████████████ ███████ and develop the early stages of the process up to the scale of 100 milliliters. █████ did in fact perform this work.

35.     Givaudan contemplated that it would continue process development from the 100 milliliter scale to larger volumes, up to the order of 1,000 liters, but short of commercial manufacturing volumes on the order of tens of thousands of liters. This is the role Givaudan typically performs in its biomanufacturing projects, as it has the expertise and facilities to do so. Givaudan did in fact perform this work.

7

36.    Givaudan contemplated that Conagen would be the manufacturer at commercial volumes on the order of tens of thousands of liters. Givaudan does not possess the facilities or capacity to perform such manufacturing.

37.    In furtherance of this goal, Givaudan contemplated that it would work with Conagen to scale up the process from the point to which Givaudan had developed the process (*i.e.*, on the order of 1,000 liters) to the commercial manufacturing scale. Because control parameters at each stage must be evaluated and adjusted with the goal of developing an optimal process (*see supra* ¶¶ 27-29), this meant the details of Conagen's prospective production facility had to be factored in at this process development stage.

38.    This is common to the industry: the configuration and capabilities of any manufacturing-scale facility must be accounted for in process development. In other words, the manufacturer's facility must be able to accommodate the requirements of the process by adjusting the various control parameters. This can be achieved either by designing a process with the specific characteristics of the commercial production facility in mind, or by building or retrofitting a facility specifically to accommodate a pre-designed process.

39.    In this case, Givaudan hoped to pursue the former strategy of designing the process from the 1,000-liter scale to production scale with Conagen's production facilities in mind. It was this goal that Givaudan had in mind when it exchanged the emails at issue with ▮▮▮ between January 11, 2018 and February 4, 2018.

40.    While Steven Chen was initially quite upset to learn that Givaudan had agreed to have ▮▮▮ perform ▮▮▮▮▮▮▮ (*see supra* ¶ 21), Givaudan worked over the course of several months after the July 2017 disclosure to secure Conagen's agreement to

manufacture ███████. It is clear that Givaudan intended to move forward with Conagen at least as late as February 2018.

**B.      Plaintiffs' Purported Trade Secret Information**

41.     Plaintiffs argue that the trade secrets in this case include: (A) information relating to scale up of ███████ production that originated with Conagen and is reflected in communications between Givaudan and █████, and (B) the feasibility of the ███████ project and BGN's intention to develop ███████. These categories are addressed in turn below.

42.     The specific information plaintiffs identify as to the former category consists of the following information conveyed by Givaudan employee Yinming Du in the aforementioned email exchange between January 11, 2018 and February 4, 2018, which include ███████ ████████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████ ███████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ███████████████████████████████████.

43.     At the time of these email exchanges, plaintiffs knew for approximately six months (since the July 2017 disclosure) of █████ involvement with Givaudan with the ███████ project. *See supra* ¶ 21.

44.     Plaintiffs were also aware of Givaudan's interest in having Conagen scale-up to production volume and manufacture ███████ in furtherance of the █████-Givaudan

process, as Givaudan pursued efforts to secure Conagen's participation, after the initial conflict over ███████ involvement, for several months after the July 2017 disclosure.

45.     The evidence supports that Conagen was aware of and in agreement with Givaudan's purpose – that is, to collaborate with ███████ and Conagen to scale up the ███████ production process with the characteristics and capabilities of Conagen's facility in mind – at the time of the email exchanges between Givaudan and ██████.

46.     As to the feasibility of the ███████ project as a potential trade secret, it is clear that the ability to produce █████████████████████████████████ was well-known in the industry well before 2018.

47.     As to BGN's purported intention to pursue an ███████ project as a potential trade secret, Givaudan employee Jay Klosterman, whose job responsibilities from August 2014 to mid-2016 included supporting BGN, testified that Givaudan was the party who had an interest in developing a process to manufacture ███████ for the reasons discussed above (*see supra* ¶ 32), which is why Givaudan disclosed its interest to Blue Cal at a BGN meeting, and why ███████ was designated by Givaudan as a potential target for BGN to pursue.

48.     Klosterman testified that he designated ███████ "deprioritized" (*see supra* ¶ 10) based on his judgment that the upfront ███████ would be cost-prohibitive. He also testified that Givaudan would not agree to have BGN pursue ███████ for this reason.

49.     There is no question that Section 7.09 of the LLC Agreement that governed BGN's operations required unanimous consent of the Board to approve projects involving affiliates of either member.

50.     Plaintiffs' witnesses, on the other hand, testified that Givaudan and Blue Cal intended to have BGN pursue ███████ at a later, unspecified date. They have not, however,

10

credibly undermined Klosterman's explanation of why Givaudan deprioritized ███████ in the first place.

51.     According to Klosterman, in January 2016 he disclosed Givaudan's interest in ██████ to █████ and ██████ willingness to perform the ███████████ at its own cost made the ████████ project a possibility from Givaudan's perspective.

52.     The research plan Yu prepared for █████████, for which Chen sought approval via BGN board proposal, sought $4.5 million in R&D funding, which is consistent with Klosterman's testimony that ████████ proposition made the ████████ project feasible by avoiding the need for Givaudan or BGN to provide such upfront funding.

53.     Klosterman further testified that his disclosure of Givaudan's interest in ███████ to █████ did not include any disclosure about BGN, including that BGN had discussed but deprioritized ████████ as a target.

54.     Based on Klosterman's testimony, the Court finds that ████████ was a compound of interest to Givaudan since at least 2014; BGN had taken no steps to initiate an ████████ project as of the time ██████ expressed willingness to bear ██████████████ costs; and Givaudan would not have agreed to have BGN pursue an ████████ project if the parties had to bear the ██████████████ costs.

55.     As a result, it cannot be said that BGN had any intention to pursue ████████ at the time ██████ informed Givaudan it was willing to perform the █████████████ work at its own cost.

**C.     The Termination of the Green Note 1 Project**

56.     The broader relationship between Givaudan and Chen's companies, of which BGN was one aspect, deteriorated between over the course of 2017 and into early 2018.

57.     Givaudan became skeptical of the capabilities of plaintiffs and their affiliates after visiting a Conagen production facility in China, which did not appear to Givaudan's representatives to be operational to the degree previously represented by Chen.

58.     Chen's unilateral decision to cause BGN to pay Conagen $1,000,000 in mid-2017 despite the lack of necessary BGN Board consent, along with several invoicing and payment disputes involving BGN, strained the parties' relationship.

59.     By March 2018, Givaudan had elected to suspend its efforts with respect to Green Note 1 based on the issues described above.

60.     Instead, Givaudan engaged ██████ as its scale-up and manufacturing partner for the ██████████ project. ██████ in turn engaged the facilities of a company known as ██████ to manufacture ██████████ for Givaudan's purchase. As of May 2022, ██████ has sold ██████ ████████████████████ of ██████████ to Givaudan for a total price of ████████████████ ██████.

**D.     Plaintiffs' Statement of Damages**

61.     As noted above, plaintiffs base their damages claim on (1) revenue projections for the ██████████ provided by Givaudan; (2) lost R&D funding and production opportunities lost to competitors as an alleged result of the alleged improper disclosures by Givaudan; (3) profit estimates based on similar projects; and, (4) in the alternative, a calculation of a reasonable royalty and the unjust enrichment derived by Givaudan.

62.     The revenue projections provided by Givaudan, by definition, do not include any aspect of the costs and overhead Conagen would have incurred had it moved forward with scale-up to production scale and subsequent manufacturing. Plaintiffs point to nominal profit margins, but they do not offer evidence to detail the calculation of such profit margins, nor expert testimony to contextualize or support such profit margins.

12

## CONCLUSIONS OF LAW

### I. <u>Standards for Demonstrating the Existence of a Trade Secret</u>

63.     Plaintiffs assert three causes of action. The first is for trade secret

misappropriation under the federal Defend Trade Secrets Act ("DTSA"). Plaintiffs' assert a

second cause of action for trade secret misappropriation under the Delaware Uniform Trade

Secrets Act ("DUTSA"). They also assert breach of the LLC Agreement's confidentiality

provisions.

64.     The DTSA defines a trade secret as information that "derives independent

economic value, actual or potential, from not being generally known to, and not being readily

ascertainable through proper means" by another and that the owner has undertaken "reasonable"

efforts to keep secret.  *See* 18 U.S.C. § 1839(3)(A)-(B); *Learning Curve Toys, Inc. v. PlayWood*

*Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).

65.     Trade secret misappropriation claims brought under Delaware law are governed

by the Delaware Uniform Trade Secrets Act ("DUTSA"), cited by plaintiffs under Count II.  *See*

6 Del. C. §§ 2001 et seq.  DUTSA defines a trade secret, in essentially the same manner as

DTSA, as:

> information, including a formula, pattern, compilation, program,
> device, method, technique or process, that: a. Derives independent
> economic value, actual or potential, from not being generally known
> to, and not being readily ascertainable by proper means by, other
> persons who can obtain economic value from its disclosure or use;
> and b. Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

6 Del. C. § 2001 (4); *Nucar Consulting, Inc. v. Doyle*, Civil Action No. 19756-NC, 2005 Del.

Ch. LEXIS 43, at *6 (Ch. Apr. 5, 2005).

66.     The definition of "trade secret" provided by the LLC Agreement is functionally identical to those under DTSA and DUTSA. *See supra* ¶ 8.

67.     The DTSA, as relevant to Plaintiffs' Count I, requires a plaintiff claiming trade secret misappropriation to identify with specificity the information it claims to be a trade secret. *See Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 U.S. Dist. LEXIS 12017 (S.D.N.Y. Feb. 20, 2008) (applying specificity requirement to DTSA claim); *see also Big Vision*, 1 F. Supp. 3d at 258 (collecting cases in Second Circuit that have recognized the specificity requirement and noting that "each Circuit Court of Appeals to have opined on this issue has required a comparable degree of specificity").

68.     The standard under DUTSA, as relevant to Plaintiffs' Count II, requires a similar showing of specificity. *See*, *e.g.*, *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2004 Del. Super. LEXIS 276, at *22 (Super. Ct. July 15, 2004).

69.     "[T]he very definition of 'trade secret' requires an assessment of the competitive advantage a particular item of information affords to a business." *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1267 (3d Cir. 1985); *Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014).

70.     Information may be a trade secret, for example, if it would allow the owner or its competitors to operate more efficiently. *See AirFacts, Inc. v. De Amezaga*, 909 F.3d 84, 96-97 (4th Cir. 2018) (compilation of publicly available information organized in such a way as to allow faster analysis of such data, allowing greater efficiency of operation, found to be a trade secret).

71.     Sole industry standing may also be sufficient to prove information provides a competitive advantage. *Vention Med. Advanced Components, Inc. v. Pappas*, No. 217-2014-CV-604, 2016 N.H. Super. LEXIS 13, at *24 (Sep. 7, 2016).

72.     Similarly, information enabling an approach or method distinct from the industry standard, particularly in the case of a substantial investment in the development of such information, may constitute a trade secret. *Heska Corp. v. Qorvo US, Inc.*, No. 1:19CV1108, 2020 U.S. Dist. LEXIS 180337, at *18-19 (M.D.N.C. Sep. 30, 2020); *see also Medidata Sols., Inc. v. Veeva Sys.*, 2018 U.S. Dist. LEXIS 199763, at *10 (S.D.N.Y. Nov. 26, 2018) (plaintiff sufficiently pled a trade secret by alleging it spent $500 million to develop technology, and that such technology enabled it to be a market leader).

73.     Relatedly, success in licensing information to others in an owner's industry may demonstrate competitive advantage if the owner can show that the information confers upon it an economic advantage. *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs.*, 893 F.3d 1176, 1188 (9th Cir. 2018).

74.     "Information that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S. Ct. 2862, 2872 (1984).

## II.     **Misappropriation and Measure of Damages**

75.     Under federal law, misappropriation of a trade secret can include "disclosure or use of a trade secret of another without express or implied consent by a person who. . . knew or had reason to know that the knowledge of the trade secret was. . . derived from or through a person who owed a duty to the [plaintiff] to maintain the secrecy of the trade secret or limit the

15

use of the trade secret." *See Franklin Interiors, Inc. v. Wesolosky*, No. 20cv1423, 2020 U.S. Dist. LEXIS 249035, at *6 (W.D. Pa. Oct. 21, 2020).

76.    DUTSA mirrors the standard set forth by federal law. The state statute notes that misappropriation can include: "disclosure or use of a trade secret of another without express or implied consent by a person who. . . knew or had reason to know that his or her knowledge of the trade was. . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *See* 6 Del. C. § 2001(2); *Chartis Warranty Guard, Inc. v. Nat'l Elecs. Warranty, LLC*, No. 5764-VCP, 2011 Del. Ch. LEXIS 28, at *1 (Ch. Jan. 28, 2011).

77.    To recover damages for trade secret misappropriation, a plaintiff must demonstrate that it suffered damages attributable to the alleged misappropriation calculable beyond mere speculation. *See Metallurgical Indus. v. Fourtek, Inc.*, 790 F.2d 1195, 1207 (5th Cir. 1986).

78.    Specifically, under the DTSA, the Court may award damages for actual loss caused by the misappropriation, along with damages for any unjust enrichment caused by the misappropriation that is not addressed by the computation of actual loss. In lieu of such damages, the Court may award damages caused by the misappropriation measured by imposition of a reasonable royalty. 18 U.S.C. § 1839(b)(3)(B).

79.    The measures of damages under the DUTSA analogously include (i) actual loss caused by misappropriation and unjust enrichment caused by misappropriation and not accounted for in actual loss, or (ii) damages caused by misappropriation as measured by a reasonable royalty. Del. Code Ann. tit. 6, § 2003.

80.    While the DUTSA does not define causation, Delaware courts have employed a proximate causation standard. *See*, *e.g.*, *Total Care Physicians, P.A. v. O'Hara*, No. 99C-11-201

JRS, 2003 Del. Super. LEXIS 261, at *4 (Super. Ct. July 10, 2003) ("Although the causation element is not defined further in the Act, and case law on the subject is sparse, statutory construction and deductive reasoning lead to the clear conclusion that the causation referred to in the Act is proximate causation.")

81.     "Delaware recognizes the traditional 'but for' definition of proximate causation. . . . [A] proximate cause is one which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Duphily v. Del. Elec. Coop., Inc.*, 662 A.2d 821, 828-29 (Del. 1995) (citations omitted).

82.     Similarly, federal courts interpreting the DTSA have espoused a "but for" standard of causation. *See*, *e.g.*, *In re Avaya Inc.*, No. 17-10089 (SMB), 2018 Bankr. LEXIS 1209, at *18 (Bankr. S.D.N.Y. Apr. 23, 2018) (plaintiff's damages may include the revenue plaintiff would have made but for defendant's misappropriation); *Linkco, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 185 (S.D.N.Y. 2002) (damages may also be measured by the defendant's unjust enrichment as a result of the misappropriation, measured by the profits the defendant obtained from using the trade secret); *see also R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 270 (S.D.N.Y. 2010) (precluding expert testimony where report did not explain how defendant had used allegedly misappropriated information to damage plaintiff because "a jury cannot test their conclusions that these acts were a but-for cause of plaintiff's damages").

83.     Proximate cause is also the standard for providing causation in a breach of contract claim. *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-00726 (CBA) (RLM), 2014 U.S. Dist. LEXIS 200610, at *28 (E.D.N.Y. Sep. 17, 2014).

**III.     Plaintiffs Have Not Demonstrated the Existence of Any Trade Secret**

84.     The first category of disclosure Plaintiffs assert as misappropriation of trade secrets is the information in the email exchange between Givaudan and ██████. The specific categories of information originating with Conagen in that email are: ██████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████.

85.     Evidence adduced by Givaudan demonstrates that Blue Cal and other manufacturers commonly publicize their ███████████████, that the ███████████ a manufacturer has are inferable from the █████████████, and that ███████████ disclosed by Givaudan in this case are not unique to Conagen.

86.     To the extent Conagen may have kept its ██████████ secret, it has failed to adduce evidence demonstrating any actual competitive advantage conferred by such secrecy.

87.      Givaudan has also adduced evidence that Conagen's ███████████████████ ████████████████████ is standard knowledge in the industry.

88.     As to process control parameters, Givaudan has shown that the ability to ██████ ████████████████████████████████████████████████ ███████████ are standard and necessary for manufacturers in the industry.

89.     Givaudan has also adduced evidence that Conagen's ████████████████████ ██████████████████████████ is not unusual in the industry. Plaintiffs have made now showing that this preference is unusual, unique, or competitively advantageous.

90.     Likewise, Givaudan has adduced evidence that the ███████████ ████████████████ is standard, and plaintiffs have not provided evidence that such capability is unusual or of competitive value.

91.     Plaintiffs have not demonstrated that any of the information in the emails from Givaudan to ██████ whether or not it was secret, was used by Givaudan, ██████ or any other party to their advantage, or at all.

92.     Plaintiffs have also failed to demonstrate the asserted information gives Conagen any unique industry standing; has been successfully licensed; enables greater efficiency; departs from industry standards; or was developed at a significant expenditure of effort and/or expense.

93.     Such particular examples of demonstrating competitive advantage are by no means exhaustive, nor could an exhaustive list ever be made. But plaintiffs have also failed to make any alternative showing of competitive advantage.

94.     In sum, in the absence of a showing that the information disclosed by Givaudan has economic value based on any secrecy it may enjoy, plaintiffs' assertion that the first category of information constitutes trade secrets fails, and therefore its claim for trade secret misappropriation based on such information fails.

95.     The second category of information Plaintiffs assert as misappropriation includes the feasibility of the ██████████ project and BGN's intention to develop ██████████.

96.     Plaintiffs have identified no sufficiently specific information about the "feasibility" of the ██████████ project sufficient to constitute a trade secret.

97.     As to plaintiffs' characterization that BGN had an intention to develop ██████████ and that such intention constituted a trade secret, there is no credible supporting evidence. It was Givaudan that had an interest in an ██████████ production process based on

19

having been limited to a sole source of ███████ and wishing to diversify its options in this regard.

98.    Givaudan disclosed its own interest in ███████ to ████. It did not disclose any interest that BGN allegedly had in such a project.  Moreover, BGN had no intention of pursuing ███████ due to the upfront ███████ costs. Givaudan would not have authorized BGN to pursue an ███████ project due to these upfront development costs, and Givaudan's authorization was required under Section 7.09 of the LLC Agreement.

99.    Plaintiffs' witnesses have testified BGN always intended to work on ███████ at some future date. They have not explained when or under what conditions this might have occurred.

100.    Givaudan's witnesses, on the other hand, have testified that BGN "deprioritized" ███████ due to the projected upfront ███████ costs being prohibitive, and that Givaudan would not have put the Green Note 1 project before BGN but for ███████ proposal to perform ███████ at its own cost. The Court finds Givaudan's explanation of the sequence of events as to ███████ credible.

101.    As such, the Court finds plaintiffs' characterization of BGN's intent to develop ███████ cannot constitute a trade secret, and Givaudan disclosed no such intent.

**IV.    Plaintiffs Have Not Demonstrated Any Damages "Caused by" Givaudan's Alleged Misappropriation**

102.    Plaintiffs primarily rely on a projection of lost profits based on financial projections for the ███████ project. *See supra* ¶ 26.

103.    To recover such damages, plaintiffs "must show that these profits were lost because of the defendant's wrongful conduct." *Syncsort Inc. v. Innovative Routines Int'l, Inc.*, Civil Action No. 04-3623 (WHW), 2008 U.S. Dist. LEXIS 35364, at *18 (D.N.J. Apr. 30, 2008)

20

(citations omitted). "The plaintiff[s] must show that were it not for the defendant's misappropriation of its trade secret it would not have suffered the damages complained of." *Id.* at *19.

104.    Plaintiffs have failed to carry this burden. They have adduced no evidence that they would have realized the lost profits they assert but for Givaudan's alleged misappropriation of trade secrets.

105.    Givaudan's witnesses have testified that Givaudan elected not to go forward with Conagen on the Green Note 1 scale-up work due to the breakdown of the broader relationship between Chen and Givaudan. *See supra* ¶¶ 56-59. Plaintiffs have not credibly disputed this testimony. As a result, the Court finds events outside of Givaudan's alleged misappropriation were the cause of Conagen's loss of any benefit it might have realized through the scale-up work and manufacturing.

106.    Relatedly, Plaintiffs have failed to show that Givaudan, ██████, or any other party used any information from Conagen that Givaudan disclosed to ██████. Blue Cal asserted the theory that Givaudan, having induced Conagen to disclose critical information and no longer needing it as a partner, cut Conagen out of the project to its detriment, depriving it of profits it would have otherwise realized. Such a scenario has no evidentiary support.

107.    The lack of evidence that ██████ or any other party used any of Conagen's alleged trade secrets is fatal to plaintiffs' case for causation. *See, e.g.*, *Firetrace USA LLC v. Jesclard*, 800 F.Supp.2d 1042, 1054-55 (D. Ariz. 2010) (while defendant was found liable for misappropriation, such misappropriation did not proximately cause any damages where plaintiff provided no evidence that defendant used any trade secret or confidential information in developing a competing product); *RLM Communs. V. Tuschen*, 66 F.Supp.3d 681, 689-99

(E.D.N.C. 2014) (no proximately caused damages where there was no evidence defendant used misappropriated trade secrets in assisting a competing bidder with an appeal that disqualified plaintiff); *Tank Connection LLC v. Haight*, 161 F.Supp.3d 957, 964-66 (D. Kan. 2014) (lack of evidence that any misappropriation of proprietary information was used to compete against plaintiff).

108.    In addition to this lack of evidence, it is not clear that ███ even could have used the information Givaudan disclosed by email in connection with the ███████ project. As discussed above, scaling up a biomanufacturing process to production scale necessarily involves consideration of the would-be manufacturer's specific facility characteristics. *See supra* ¶¶ 27-38. In other words, information about Conagen's facility would not bear on how the ███████ production process would be scaled up for production by ████. The information from Conagen that Givaudan conveyed to ████ consisted in essence of how Conagen's facility could accommodate and factor in to the process design. This information was ultimately irrelevant to how ████ could do so using ████ facilities.

109.    Plaintiffs' alternative damages measures based in unjust enrichment and reasonable royalty suffer the same flaw, as both the DTSA and the DUTSA require that any damages, however measured, be "caused by" the alleged misappropriation. *See supra* ¶¶ 71-73. For the same reasons plaintiffs have not shown any lost profits were caused by Givaudan's alleged misappropriation, they have not demonstrated causation sufficient to recover under their alternative measures.

110.    This same deficiency precludes recovery by Plaintiffs on their breach cause of action. *See, e.g.*, *Kuroda v. SPJS Holdings*, L.L.C., 971 A.2d 872, 883 (Del. Ch. 2009) (plaintiff "must demonstrate: first, the existence of the contract, whether express or implied; second, the

breach of an obligation imposed by that contract; and third, the resultant damage to the

plaintiff").


Dated:        May 6, 2022
              Buffalo, New York


                                        GOLDBERG SEGALLA LLP


                                By:     /s Ryan Pitman_____
                                        Christopher J. Belter
                                        Ryan G. Pitman
                                        *Attorneys for Plaintiff*
                                        *Givaudan SA*
                                        665 Main Street
                                        Buffalo, New York 14203-1425
                                        Phone: 716.566.5400
                                        Fax:    716.566.5401
                                        cbelter@goldbergsegalla.com
                                        rpitman@goldbergsegalla.com