UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
GIVAUDAN SA,  :
  :
                          **Plaintiff,**  :      **18-CV-03588 (JGK)**
  :
v.  :
  :
  :
CONAGEN INC.,  :
  :
                          **Defendant.**  :
  :
------------------------------------------------ x

## CONAGEN INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Conagen Inc. ("Conagen") respectfully submits this Proposed Findings of Fact and Conclusions of Law. The following statements are meant to serve as an overview of the facts to be litigated at trial. Accordingly, Conagen reserves the right to prove additional details regarding the below facts that have been identified throughout the discovery process. Conagen further intends to offer evidence to rebut evidence offered by Plaintiff.

**I.    THE PARTIES AND INDIVIDUALS**

1. Plaintiff Givaudan SA ("Givaudan") is a company organized under the laws of Switzerland. Givaudan is a manufacturer of flavors, fragrances, and active cosmetic ingredients. Its principal place of business is located at 5, Chemin de la Parfumerie, 1214 Vernier, Switzerland.

2. Juerg Witmer is the former chairman of Givaudan and retired in March of 2017.

3. Christiaan Thoen is the former Head of Science and Technology for the Flavor Division of Givaudan. Mr. Thoen served in that position from June 2011 to October 2015. After October 2015, Mr. Thoen became a member of Givaudan's Executive Board and took the role of

Chief Technology Officer across Givaudan's flavors, fragrances, and active beauty divisions until his retirement in September 2018.

4. Roberto Garavagno is legal counsel for Givaudan.

5. Conagen is a Massachusetts corporation with a principal place of business at 13-15 Deangelo Drive, Bedford, Massachusetts 01730. Conagen is in the business of researching and developing bio-manufacturing processes and techniques.

6. Steven Chen is the current president of Conagen. Mr. Chen has served as president since Conagen's founding in 2010.

7. Holly You served as legal counsel to Conagen until around 2018.

## II. GIVAUDAN'S ORIGINAL INVESTMENT AND SUBSEQUENT DISCUSSIONS

8. On July 3, 2015, Conagen and Givaudan entered into a stock purchase agreement under which Givaudan invested $10 million in Conagen in exchange for a 5% equity interest in Conagen.

9. Givaudan maintains possession of this 5% equity interest to this day.

10. Following this investment, Givaudan and Steven Chen had subsequent discussions about Givaudan making additional investments in Conagen, along with other related companies such as SweeGen International Limited ("SweeGen") and Anhui Longjin Bio-Technology Co., Ltd. ("Anhui"). Specifically, Steven Chen had discussions with Christiaan Thoen, Juerg Witmer, and Roberto Garavagno in relation to potential investments in these companies.

11. The parties all agreed that Givaudan would make an additional investment in Conagen. Indeed, on September 12, 2016, Juerg Witmer sent an email to Steven Chen expressing a willingness to make an additional investment in Conagen and stating: "In order to

- 2 -

show our commitment I am perfectly happy to sign a term sheet on Conagen as per the attachment together with you when we meet next Thursday in San Francisco and *to effect the additional equity payment for Conagen immediately*."

### III. THE TERM SHEET BETWEEN GIVAUDAN AND CONAGEN

12. On September 15, 2016, Conagen and Givaudan executed a term sheet (the "Term Sheet"), which contains six "Key Terms".

13. The Preamble of the Term Sheet states that the Term Sheet is "in regards to Givaudan taking an equity stake in Conagen." It also states that "[t]he parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties."

14. Thus, the Term Sheet contemplated two phases to the transaction: (1) an initial payment of $10 million for an additional 5% of Conagen, and (2) the envisioned negotiations over other investments.

15. The term sheet also contemplated that the agreements resulting from the envisioned negotiations might differ from what the term sheet outlined.

#### A. The Phase I Transaction

16. Phase I of the transaction is described in Key Term 1 of the Term Sheet, which states as follows:

> Givaudan will invest an additional $10M for an additional 5% of Conagen, based upon a $200 M evaluation from the 2015 Givaudan/Conagen deal. Conagen will adjust its management structure to include legal/finance, CSO and office and regulator managers, and securing confidentiality and non-compete agreements from its CSO Oliver Yu and CEO Steven Chen."

17. Following the execution of the Term Sheet, Givaudan transferred $10 million to Conagen via wire transfer.

18. While Givaudan now claims that the $10 million equity transaction in Conagen was reversible, there is no basis to infer that was the mutual intent of the parties at the time of execution. Had Givaudan intended the $10 million to be refundable, it would have been easy enough to include that provision in the Term Sheet. The parties did not do so. It is not the Court's role to rewrite parties' agreements.

19. While the lack of a written provision is dispositive, I also reject the assertion that Givaudan intended the $10 million to be refundable. Contemporaneous internal Givaudan documentation indicates that Givaudan considered the Phase I investment to have been concluded upon payment. In an October 2016 internal Givaudan board presentation, one slide used in the presentation stated that "This informs the Board on an increase in equity stake in Conagen from 5 to 10% for an additional $10,000,000: Givaudan acquired an initial 5% equity stake in Conagen for a consideration of $10,000,000 on July 3, 2015. The Givaudan's Board of Directors is informed that another 5% stake for $10,000,000 has been acquired."

20. The board slide indicates that as of October 2016, the Chairman of the Board and the signatory to the Term Sheet, viewed the Conagen equity transaction as having been completed.

21. Givaudan today describes this $10 million investment as an "advance." But the contemporaneous documentation does not mention an "advance." To the contrary, the slide definitively told the board that Givaudan had already acquired a 5% stake in Conagen, on top of the 5% stake it had acquired in 2015.

22.   Givaudan consistently took that view during later negotiations. In late November or early December 2016, Steven Chen, Mauricio Graber, and Christiaan Thoen had a phone call about the status of the negotiations. Mr. Chen sent an email on December 1, 2016, to Mr. Graber and Mr. Thoen memorializing that call. Mauricio Graber replied via email to Steven Chen confirming that "Givaudan is a 10% equity investor of Conagen" and stated that they needed to discuss "right of first refusal versus exclusivity." Again, there was no suggestion that Givaudan was not yet an investor or that the payment was an advance.

23.   On May 10, 2017, Conagen delivered the stock certificates to Givaudan reflecting its 5% equity interest in Conagen. Givaudan received those stock certificates via Federal Express on May 11, 2017 and retains the certificates and the benefit of ownership to this day.

24.   The first time that the concept of an "advance" crept into the discussion was on May 11, 2017, when in-house attorney, Mr. Garavagno, used that word in a letter purporting to reject the stock certificates. By that time, the matter appeared to be heading towards litigation. These post-hoc statements by an attorney do not inform the Court of the parties' intent at the time the agreement was executed.

25.   Neither the Term Sheet, nor any contemporaneous evidence, reflected the view of either party that the $10 million payment by Givaudan to Conagen was an advance, rather than the purchase price for a second 5% tranche of Conagen equity.

**B.   The Phase II Transactions**

26.   Key Terms 2-4 of the Term Sheet reflect the terms for negotiations over additional investments in Conagen affiliates:

> Key Term 2: "Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F. Exclusivity will convert to non-exclusivity should Givaudan fail to use reasonable efforts to commercially exploit mature IP, to an industrially viable extent, within 12 months from it being licensed to

Givaudan."

Key Term 3: "The parties will agree on licensing terms for the commercial exploitation of the specified IP by Givaudan."

Key Term 4: "The parties will discuss in good faith separately whether and at which conditions further investments in Blue California Group companies may be made." The "Blue California Group companies" included SweeGen and Anhui, about which the parties had engaged in prior discussions regarding further investments.

27. At the time of the signing of the Term Sheet, the parties were unsure what intellectual property any further agreements regarding Key Term 2 would cover. The term "specified IP," found in Key Term 2, is not defined in the Term Sheet. At the time of the signing of the Term Sheet, the parties had not determined what the "specified IP" was.

28. The term "mature" in Key Term 2 is undefined, and the parties had not agreed at the time of the signing of the Term Sheet what constituted "mature" IP. Neither does Key Term 2 explain what the alternative to "mature" IP (i.e., "immature IP") would be.

29. These and other specifics regarding any agreements to be reached relating to these Key Terms of the Term Sheet were intended by the parties to be fleshed out in further negotiations.

30. Key Term 5 of the Term Sheet stated that "The confidentiality obligations agreed between the parties in the Limited Liability Company Agreement of BGN Tech (dated 21.02.2014) shall apply to the parties and be integrated hereto by reference."

31. Key Term 6 of the Term Sheet stated that "The law and jurisdiction clauses agreed between the parties in the Limited Liability Company Agreement of BGN Tech (dated 21.02.2014) shall apply to the parties and be integrated hereto by reference." The Limited Liability Company Agreement of BGN Tech contains a Delaware choice of law provision, and accordingly Delaware law applies to the claims in this case.

32. Negotiations relating to formal agreements implementing Key Terms 2 through 4 of the Term Sheet occurred between Holly You and Roberto Garavagno from the time of the execution of the Term Sheet, September 15, 2016, through at least November 2016. During this time, Mr. Chen and Mr. Thoen were also in constant contact. These discussions also concerned Givaduan's potential investments in SweeGen and Anhui.

33. During this time the parties were unable to come to agreement on the scope of subsequent agreements and which IP would be covered under which categories. The parties negotiated the scope of the "specified IP" contained in Key Term 2 and what it meant to "commercially exploit mature IP."

34. As previously stated, on December 1, 2016, Mr. Chen sent an email to Mr. Graber and Mr. Thoen, summarizing a phone call among them, to which Mr. Graber replied that "Givaudan is a 10 percent equity investor of Conagen" and that they needed to discuss "right of first refusal versus exclusivity." This demonstrates that negotiations between the parties had not stopped; they were continuing to negotiate with each other regarding possible agreements to implement Key Terms 2-4 of the Term Sheet.

35. Indeed, Mr. Chen and Mr. Thoen remained in constant contact with each other through at least February 2017, further demonstrating that negotiations between the parties were ongoing.

36. Despite failing to reach agreement on these further investments, the parties remained in contact regarding the ongoing negotiations through May 2017. Mr. Garavagno's May 2017 email signaled that Givaudan did not want to continue pursuing negotiations.

**COUNT 1 – BREACH OF CONTRACT**

37. The parties agree that pursuant to Key Term 6 of the Term Sheet, which incorporates certain terms of the BGN LLC Agreement, Delaware law governs the interpretation of the Term Sheet.

38. To establish a breach of contract claim under Delaware Law, Givaudan must show three elements: (1) the existence of a contract, (2) breach, and (3) resulting damages. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

39. The Term Sheet constitutes a contract, with a two-phase structure. In the first phase, reflected in the preamble and Key Term 1, Givaudan agreed to pay $10 million immediately to obtain 5% of the equity of Conagen. In the second phase, the parties agreed to negotiate in good faith over further investments.

40. With respect to further investments, the Term Sheet states that "The parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties." This constitutes an agreement between the parties to negotiate in good faith regarding one or more agreements that contain terms and conditions similar to the specified Key Terms and other terms and conditions to be negotiated between the parties.

41. Conagen did not breach the duty to negotiate in good faith with respect to this contract. Proof that a party breached a duty of "good faith" generally requires demonstrating "bad faith." *DV Realty Advisors LLC v. Policemen's Annuity and Ben. Fund of Chicago*, 75 A.3d 101, 110 (Del. 2013); *see also W. Palm Beach Hotel, LLC v. Atlanta Underground, LLC*, 626 F. App'x. 37, 42-43 (3d Cir. 2015) (noting that to breach a duty to negotiate in good faith

generally requires "deliberate misconduct, such as reneging on closed contractual terms, imposing unreasonable terms solely in the hope of scuttling a deal, or…exploiting a counterparty's sunk costs") (internal quotations omitted).  Bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 346 (Del. 2013).  It is insufficient to point to the length of negotiations alone, and a mere delay on the part of one of the parties cannot constitute bad faith. *See Hart v. Eye*, No. CIV.A.CPU4-13-003183, 2014 WL 6989864, at *4 (Del. Com. Pl. Dec. 11, 2014)

42. There is no evidence to support a finding of bad faith.  Instead, the course of negotiations here shows a legitimate back and forth between Conagen and Givaudan.  The parties remained in constant communication through May of 2017 regarding possible agreements.  It was Givaudan, not Conagen, that broke off negotiations by demanding a return of Givaudan's $10 million investment.

43. In addition, the Term Sheet did not define what the "specified IP" covered by Key Term 2 was, leaving it open for the parties to negotiate after the signing of the Term Sheet.  Nor did the Term Sheet specify what was meant by "mature" IP.  In light of this, the parties' failure to reach agreement on these issues cannot constitute bad faith by Conagen.

44. Even if Conagen had breached a contract, Givaudan cannot show entitlement to damages.  Where the parties have an agreement to negotiate in good faith, and the record shows that the parties would have reached an agreement but for the bad faith, "the plaintiff is entitled to

recover contract expectation damages." *SIGA Techs., Inc. v. PharmAthene*, 67 A.3d 330, 350-51 (Del. 2013). Givaudan has expressly disclaimed expectation damages.

45. Givaudan asserts that it is pursuing a claim for reliance damages, which would only amount to "its actually-incurred costs and expenses." *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 58 A.3d 984 (Table), 2012 WL 6049157, at *3 (Del. Dec. 5, 2012). Here, Givaudan has made no showing that it has suffered a loss, nor presented evidence of costs and expenses incurred. In 2015, Givaudan paid $10 million for 5% of the equity of Conagen, and it did the same in 2016. Givaudan still holds that equity, and there is no evidence that Givaudan has suffered any damages as a result, much less in the amount of $10 million.

46. In summary, I find that Givaudan has failed to meet its burden to establish a breach of contract or to present a viable theory of damages. Givaudan is awarded no relief on Count I.

**COUNT 2 – PROMISSORY ESTOPPEL**

47. To establish liability under a promissory estoppel claim, Givaudan must show that Conagen made a promise with the expectation to induce action or forbearance; that Givaudan reasonably relied on the promise; that Givaudan suffered an injury as a result; and that injustice can be avoided only by enforcement of the promise. *Fanean v. Rite Aid Corp. of Del., Inc.*, 984 A.2d 812, 122 (Del. Super. Ct. 2009).

48. "Promissory estoppel does not apply…where a fully integrated, enforceable contract governs the promise at issue." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013); *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, No. N14C-12-112 WCC CCLD, 2015 WL 5968726, at *5 (Del. Super. Ct. Sept. 25, 2015); *Cavi v. Evolving Sys., Inc.*, No. 15-1211, 2017 WL 658470, at *10 (D. Del. Feb. 17, 2017).

49.     Here, the Term Sheet constituted an enforceable two-phase agreement.  In the first phase, Givaudan purchased 5% of Conagen's equity for $10 million.  The Term Sheet also created enforceable obligations between the parties to negotiate in good faith regarding one or more agreements that contain terms and conditions similar to the Key Terms 2-4.

50.     Because there is an enforceable contract that governs the promise at issue, there can be no liability under a theory of promissory estoppel.

51.     Even if the Term Sheet did not constitute a contract, Givaudan's claim for recovery under a theory of promissory estoppel would fail because Givaudan has failed to produce evidence that it has been injured or that injustice can be avoided only by enforcement of the promise.

52.     On the injury point, there is no evidence that Givaudan has suffered an injury as a result of its $10 million investment in Conagen.  It retains a 5% interest in Conagen, which is the same price it paid for the same amount of equity in 2015.

53.     Moreover, promissory estoppel is a remedy used to enforce a promise.  Here, the promise Givaudan claims it relied upon was a promise by Conagen to negotiate in good faith.  There is no practical way to enforce such a promise.  As a result, this is not a proper case for the application of promissory estoppel.

54.     What Givaudan really appears to desire is to enforce a promise by Conagen to exchange the stock certificates for the $10 million.  For the reasons stated above, however, there is no evidence such a promise was ever made.

55.     Finally, promissory estoppel is only an appropriate remedy when it would be just to do so.  For the reasons stated in the related case *Phyto Tech Corp. v. Givaudan SA*, 18-cv-

06172, I find that Givaudan misappropriated Conagen trade secrets, and for this independent reason, it would be unjust to require Conagen to reverse the equity transaction against its will.

56. Conagen is not liable under a theory of promissory estoppel, and Givaudan is awarded no relief on Count II.

**COUNT 3 – UNJUST ENRICHMENT**

57. To establish an unjust enrichment Givaudan must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, at 1130 (Del. 2010).

58. A claim for unjust enrichment is unavailable when there is a contract that governs the parties' relationship. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). As discussed above, the Term Sheet constitutes an agreement. Because there is an enforceable contract that governs the promise at issue, there can be no liability under a theory of unjust enrichment.

59. Even if the Term Sheet did not constitute a contract, there would still be no unjust enrichment here because Givaudan provided no proof that it has been impoverished, much less in the amount of the claimed damages of $10 million. Givaudan invested $10 million into Conagen, in exchange for 5% of the company, the same price it paid in 2015 for the same amount of equity. Givaudan has not been "impoverished" by the investment, for which it still holds the benefit.

60. Moreover, there is ample justification for the exchange. The price paid was far and reflective of a prior transaction between the parties. Givaudan voluntarily paid the amount and received valuable equity in return. Conagen has every right to retain the proceeds,

particularly when Givaudan held the stock certificates and benefits of ownership for over 5 years.

61. Nor is this a proper case for the application of unjust enrichment because there is an adequate remedy at law. Givaudan could have sued under the Term Sheet for damages, and indeed has pled a cause of action in Count I for breach of contract.

62. Conagen is not liable for an unjust enrichment and Givaudan is entitled to no relief on Count III.

Dated: May 6, 2022

Respectfully submitted,

By: */s/ Katherine A. Helm*

Katherine A. Helm
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel. (212) 698-3500
khelm@dechert.com

Martin J. Black (pro hac vice)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel. (215) 994-4000
martin.black@dechert.com

*Attorneys for Defendant Conagen Inc.*