**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**PHYTO TECH CORP., ET AL.,**

                    **Plaintiffs,**                    **18-cv-6172 (JGK)**

          **- against -**                              <u>**MEMORANDUM OPINION**</u>
                                                       <u>**AND ORDER**</u>

**GIVAUDAN SA,**

                    **Defendant.**
_____

**JOHN G. KOELTL, District Judge:**

     The plaintiffs, Phyto Tech Corp., d/b/a Blue California
("Blue Cal") and Conagen, Inc. ("Conagen"), brought this action
against Givaudan SA ("Givaudan") alleging misappropriation of
trade secrets in violation of the federal Defend Trade Secrets
Act ("DTSA") and the Delaware Uniform Trade Secrets Act
("DUTSA"). The plaintiffs also assert a breach of contract claim
based on an alleged violation of a confidentiality provision in
the agreement creating BGN Tech LLC ("BGN"), a joint venture
between Blue Cal and Givaudan (the "BGN LLC Agreement").
Givaudan denies that it misappropriated any trade secrets and
denies that the plaintiffs have proven any damages from any
alleged misappropriation or breach of contract.

     The Court held a non-jury trial on June 6, 7, 8, and 15,
2022, in this case and the companion case of <u>Givaudan SA v.</u>
<u>Conagen, Inc.</u>, No. 18-cv-3588 (S.D.N.Y. filed Apr. 23, 2018).
Having reviewed the evidence and assessed the credibility of the

witnesses, the Court now makes the following Findings of Fact and reaches the following Conclusions of Law. To the extent relevant, the Court also incorporates the Findings of Fact in the companion case.

## FINDINGS OF FACT

### I. The Parties

1. Blue Cal, a California corporation with a principal place of business in California, is in the business of research, development, and manufacturing of natural ingredients. ECF No. 89 at 39.

2. Conagen focuses on discovery and commercialization of materials through organic and biosynthetic pathways. ECF No. 89 at 39.

3. Steven Chen is the president of Conagen. Trial Transcript ("Tr.," ECF Nos. 117, 119, 120, 122, 124) 239.

4. Dr. Oliver Yu co-founded Conagen with Chen and is its Chief Executive Officer. Tr. 147, 151.

5. Givaudan, a Swiss corporation, sells flavors and fragrances to industry customers. ECF No. 89 at 39.

6. Christiaan Thoen is the former Head of Science and Technology for the Flavors Division of Givaudan. Tr. 34.

7. Gary Kleman is a senior research investigator with Givaudan. Tr. 323.

8.    Jay Klosterman is the director of commercial innovation within the Givaudan flavor ingredients team. Tr. 374-375.

## II. The Biomanufacturing Industry

9.    Synthetic biology, or biomanufacturing, of the sort involved in this case is the use of microbes to produce a product. Tr. 324.

10.    Synthetic biology consists of (1) genetically engineering a microorganism capable of producing a target compound by its metabolic functions, Tr. 163, 326; (2) developing a laboratory-scale process to investigate fermentation conditions and downstream processing conditions, Tr. 163-164, 326-327; (3) scaling up the process from the bench level of only a few milliliters in a succession of vessels of increasing volume, Tr. 164, 167; (4) developing a manufacturing process to make the target compound continually on a large scale as efficiently as possible, Tr. 164; and (5) commercialization, including marketing and sales of the target compound, Tr. 164.

11.    The process development and scale-up phases of biomanufacturing involve optimization of control parameters that affect the environment in which the microorganism lives, along with its metabolic and reproductive functions. These factors include media composition, carbon and nitrogen feeding, pH,

3

temperature, agitation, air flow, and others. Tr. 166-168, 329.

12.   Part of the scale-up phase is seed train design. Seed train refers to the progression from a test tube volume, to a flask volume, to fermenters of increasing size, and finally to the production-scale bioreactor. Tr. 168-169, 331-332.

13.   Inoculum size, meaning the percentage volume of the microorganism relative to the vessel it is introduced to, is part of seed train design. Tr. 169-170.

14.   Each seed train is unique to the microorganism and the product. Tr. 169.

15.   More generally, each biomanufacturing process is specific to the organism, target product, and manufacturing facility. Tr. 229-231.

16.   In order to take a biomanufacturing process designed for one manufacturing facility and move it to another manufacturing facility, certain adjustments may need to be made to the biomanufacturing process to account for differences between the facilities. Tr. 230-231.

17.   Because of this specificity, it is preferable when designing a biomanufacturing process to understand the capabilities of the ultimate manufacturing facility to ensure that the process and the facility will be compatible. Tr. 329-333.

4

### III. The Parties' Joint Venture

18.    The relationship between Givaudan and Chen began sometime prior to 2014 with Blue Cal supplying a sweetener product to Givaudan. Tr. 242-243.

19.    In 2014, Blue Cal and Givaudan entered into a joint venture known as BGN as embodied in the BGN LLC Agreement. Tr. 35-36; DX-49.

20.    Thoen was appointed as one of two Givaudan-appointed BGN board members. Blue Cal appointed the other three board members. Tr. 37.

21.    The BGN LLC Agreement provided that Givaudan would contribute capital and certain intellectual property ("IP") and that Blue Cal would contribute IP concerning three ingredients:

█████████████████████████████████████████████ DX-49 at BLUECAL9033-000008, BLUECAL9033-000022 to 025; Tr. 37.[1]

22.    The BGN LLC Agreement contained a confidentiality provision that required the parties to keep confidential any information "from or regarding the other Member (or its Affiliates) or the Company in the nature of trade secrets or that otherwise is confidential . . . ('Confidential Information'), the release or disclosure of which could be

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

damaging to the other Member (or its Affiliates)." DX-49 at BLUECAL9033-000052 to 053.

23.    The BGN LLC Agreement also included a Section 7.09, entitled "Matters Requiring Unanimous Consent of the Board," which governed among other things entry by BGN into any "Related-Party Transaction," Section 7.09(u); providing payments to or liability for BGN in an aggregate principal amount exceeding $25,000, id.; and assuming any encumbrances or similar obligations by BGN in an aggregate principal amount in excess of $25,000, Section 7.09(z). DX-49 at BLUECAL9033-000036 to 037; Tr. 38-40.

24.    The BGN LLC Agreement also included a Section 11.01 entitled "Other Opportunities," which provided in relevant part:

> Subject to compliance with the other provisions of this Article XI and their other commitments under this Agreement and the Ancillary Agreements . . . any Director (other than the CEO Director) or Member or its Affiliate (other than the Company and its Subsidiaries) may conduct any business or activity whatsoever outside of the Company without any accountability to the Company or any other Member . . . regardless of whether (i) such outside business or activity of such Director or Member or such Affiliate competes with the business of the Company, (ii) such outside business or activity by such Director or Member or such Affiliate is or is not in the best interest of the Company or the other Members (unless such business or activity is performed on behalf of the Company), or (iii) such Director or Member or such Affiliate became aware of such outside business or activity in her or his role with the Company or as a Member (including through its appointed Directors), as applicable, and this Agreement shall not give the Company, any Member or other Person any interest in, or

> right to, any such outside business or activity or any
> proceeds, income or profit thereof or therefrom; . . .
> the Company and the Members hereby acknowledge that the
> conduct (or the omission of conduct) of any business or
> activity outside of the Company shall not: (i) constitute
> a breach of this Agreement; (ii) constitute a breach of
> any fiduciary or other duty owed to the Company or any
> Member; or (iii) otherwise give rise to any liability to
> the Company or any Member . . . and no Director (other
> than the CEO Director) or Member shall be obligated
> hereunder to offer any business opportunity to the
> Company or any other Member or be restricted from
> pursuing any business opportunity offered to the
> Company.

DX-49 at BLUECAL9033-000052.

25.   The "Company" is defined in the BGN LLC Agreement as BGN. DX-49 at BLUECAL9033-000006. "Member" is defined as including Givaudan and Blue Cal. Id. at BLUECAL9033-000014.

26.   The import of Section 11.01 of the BGN LLC Agreement is that Givaudan and Blue Cal were permitted to pursue activities outside of BGN, even if those activities competed with BGN, and Givaudan and Blue Cal were not required to offer any business opportunity to BGN. However, under Article XII of the BGN LLC Agreement, Givaudan and Blue Cal were required to hold in confidence any trade secrets or otherwise confidential information received from the other party or from BGN. DX-49 at BLUECAL9033-000052 to 053.

27.   Klosterman was the business development manager who managed BGN on behalf of Givaudan from 2014 to 2016, along with his other job responsibilities at Givaudan. Tr. 375.

28.   In September 2014, Givaudan and Blue Cal met to discuss the list of compounds of interest to Givaudan. Klosterman prepared a slide presentation for that meeting that listed Givaudan's compounds of interest, referred to as the "wish list." See DX-53. The wish list included ███████████, among other compounds. Id. at BCCONAGEN000268; Tr. 68-70, 378.

29.   Givaudan has used ██████████ since at least 2007 as a precursor to ingredients that Givaudan uses in various flavors that it sells. Givaudan was interested in developing a new process to biomanufacture █████████ because Givaudan had just one source from which to purchase ████████. Tr. 71, 333-334, 379.

30.   Givaudan wished to develop a more cost effective process and to avoid being limited to a single source for ██████████ as a matter of supply chain resiliency and business continuity. Tr. 334, 425.

31.   Thoen testified that a biomanufacturing project to produce ████████, from Givaudan's perspective, would only be viable if it resulted in a ██ price reduction compared to Givaudan's legacy supplier of ██████████. Thoen also testified that Givaudan's rolling 12-month purchase needs for ██████████ were relatively low. Tr. 70-71.

32.   Klosterman testified that he designated ██████████

as "deprioritized" in his September 2014 slide presentation for BGN based on his judgment that the upfront research and development costs would be cost prohibitive. Klosterman also testified that Givaudan would not have asked BGN to pursue ███████████ for this reason. Tr. 381-383.

33.   Yu testified that he made general comments to Givaudan during certain early discussions relating to ███████████ regarding Conagen's experience in amino acid production and explained that this experience could be useful in developing ███████████ products. Yu further testified that Givaudan did not express particular interest in his input on ███████████ during those discussions. Tr. 178-179.

34.   Yu acknowledged that Givaudan represented that Givaudan deprioritized ███████████ based on Givaudan's assessment that the financial case for an ███████████ project was insufficient. Tr. 176-177, 204.

35.   Chen testified that he understood "deprioritized" to mean Givaudan would like to develop an ███████████ project at some later stage. Tr. 245.

36.   A December 2015 BGN board meeting presentation did not include ███████████ in a list of "key initiatives." See DX-54 at GIV0000165-GIV0000198.05.

**IV. Givaudan's Collaboration with ████ and the Prospective ████████ Project**

37.   In or about January 2016, Givaudan met with ████ ████████████████████ to discuss potential partnerships.

38.   In January 2016, Klosterman disclosed Givaudan's interest in ████████ to █████, and █████ expressed willingness to perform ████████████████████ work at its own cost. Tr. 384-385; DX-79. According to Klosterman and Thoen, this proposal made an ████████ project a possibility from Givaudan's perspective. Tr. 72-73, 385.

39.   Givaudan's intent in developing an alternative supplier for ████████ was not confidential information that belonged to BGN and Givaudan was permitted under Section 11.01 of the BGN LLC Agreement to pursue an alternative source for ████████.

40.   Klosterman testified that his disclosure of Givaudan's interest in ████████ to █████ did not include the disclosure of any information about BGN other than the publicly available information that BGN existed and could potentially provide Givaudan with manufacturing services. Tr. 385-386; DX-79.

41.   Givaudan decided to pursue the ████████ project and contemplated that Givaudan, █████ and Conagen would each perform different roles within their respective areas of expertise and focus. Tr. 387-388.

42.   Givaudan contemplated that ███████ would perform ████████████████████. In other words, ███████ would ██████████ ████████████████████████████████████████████████ and develop the early stages of the process up to the scale of 100 milliliters. Tr. 336.

43.   Givaudan contemplated that it would continue process development from the 100-milliliter scale to larger volumes, up to the order of 1,000 liters, but short of commercial manufacturing volumes on the order of tens of thousands of liters. Development at that stage in the development process is the role Givaudan typically performs in its biomanufacturing projects, as it has the expertise and facilities to do so. Tr. 327-328, 336.

44.   Givaudan contemplated that Conagen would be the manufacturer at commercial volumes on the order of tens of thousands of liters. Tr. 336-337.

45.   In a May 2016 BGN board meeting, Givaudan disclosed to Blue Cal information relating to a potential collaboration with an undisclosed party on an undisclosed project that, if the technology was successful, could eventually use the plaintiffs' capabilities for scale-up and manufacturing. DX-55 at BCCONAGEN000509; Tr. 71-73.

46.   Although Blue Cal inquired as to the identity of the

target and the third-party partner, Givaudan was obligated by a
confidentiality agreement with ████ to withhold such
information. No one from Blue Cal or Conagen told Givaudan that
Givaudan's refusal to disclose that information was
unacceptable. Tr. 108-109.

47.   Yu testified that he assumed that the third-party
partner may have been an academic laboratory. Tr. 179, 233. But
BGN board presentations for meetings that Yu attended in
November 2016 and May 2017 referred to a "partner company." Tr.
176; DX-56 at BCCONAGEN000054; DX-63 at BCCONAGEN000116.

48.   On August 3, 2016, Givaudan and ████ entered into a
"Collaboration and License Agreement" pursuant to which ████
was to identify a biosynthetic pathway to produce ████████.
DX-80; Tr. 102-103.

49.   In September 2016, ████ informed Givaudan that it
was considering ████████████████ as the primary
production strain for the project due to the ████ team's
familiarity with the organism. DX-76.

50.   In May 2017, Givaudan presented the undisclosed
project, referred to as "Green Note 1," at a BGN board meeting
as making good progress, with potential to transfer to Conagen
for scale up in early 2018. Tr. 421-423; DX-63 at
BCCONAGEN000116.

51.    The plaintiffs stress that Givaudan was aware that ███ was a competitor to Conagen. But there was nothing in the BGN LLC Agreement that prevented Givaudan from working with a competitor of Conagen. Moreover, Givaudan was not required to present to BGN or the plaintiffs the opportunity to develop another source of ███████ for Givaudan.

### V. Givaudan's Disclosure of the Target and the Third-Party Partner

52.    On June 23, 2017, Conagen and Givaudan entered into a "Mutual Confidentiality Agreement," which stated that the parties "intend[] to disclose certain Confidential Information . . . for the purposes of evaluating business opportunities and engaging in a business relationship related to the scale-up and manufacturing of ████████████." DX-68 at BlueCal000103; Tr. 187-188.

53.    At the time that Givaudan disclosed to Conagen that ███████ was the subject of the Green Note 1 project, Conagen had not yet done any experiments relating to ██████. Tr. 178.

54.    Givaudan disclosed to Conagen in July 2017 that ████ was performing ████████ for the ██████ project. See DX-64; Tr. 200-202.

55.    This disclosure included information relating to the fermentation process that ████ had developed, including the

13

identification of ███████████████████ as the microbe and specified fermentation conditions. Yu acknowledged that Givaudan disclosed that information in order to collaborate with Conagen on the ███████████ project. DX-64 at BCCONAGEN000020; Tr. 210, 338-339.

56.   Kleman testified that ████████████████████ has been used in food production since the 1950s and is a well-understood organism. Tr. 339-340.

57.   Yu testified that he was upset and disappointed when he learned of ██████ involvement due to Conagen's preference that Givaudan not fund direct competitors to Conagen. Tr. 180.

58.   Yu also testified, however, that Amyris, another company, was a direct competitor of Conagen, and that Conagen was made aware that Givaudan was working with Amyris by no later than November 2016. DX-56 at BCCONAGEN000044; Tr. 133, 135, 165-166, 229.

59.   Yu also acknowledged that Givaudan was not restricted from working with any third party that Givaudan chose. Tr. 229. This understanding is consistent with Section 11.01 of the BGN LLC Agreement. See DX-49 at BLUECAL9033-000052.

60.   In addition, Yu and Chen acknowledged that Conagen and Blue Cal had entered into non-disclosure agreements with ██████ in the past, and that Yu and Chen are acquainted with the

14

founder of ███. DX-84; DX-85; Tr. 219-222, 292-295, 297.

61.   Chen also testified that several ███ employees have visited Conagen facilities. Tr. 295-296.

62.   Yu testified that Conagen wanted to be involved in the ████████ project as of July 2017 despite learning of ███████ role in the project. Yu further testified that Conagen's decision to be involved in the ███████ project was voluntary. Tr. 202-203, 232.

63.   Yu also testified that from that point forward, Conagen knew that information that it was providing to Givaudan relating to ██████ concerned a project that involved Givaudan, Conagen, and ████. Tr. 203.

64.   On July 10, 2017, Chen emailed the BGN board members regarding Givaudan's disclosure that the third-party partner on Green Note 1 was █████. In that email, Chen characterized the news as "disturbing" and "shocking" and stated that "[t]he happy marriage of BGN suddenly seems like the movie 'Sleeping with the Enemy[.]'" Chen also attached a draft board resolution pursuant to which BGN would have agreed to contract with a new partner to conduct the research and development for Green Note 1. DX-58 at BCCONAGEN000011; DX-59; Tr. 75-76.

65.   In his response, Thoen "point[ed] out that it has been communicated to BGN all along that Givaudan is working with a

3rd party on the organism design for Green Note 1" and voted "no" on the board resolution, as did the other Givaudan-appointed director. DX-58 at BCCONAGEN000010-011; Tr. 77.

66.     Nevertheless, Chen caused $1 million to be transferred from BGN to Conagen in violation of the BGN LLC Agreement. Tr. 77.

67.     Chen testified that he considered this transfer a "stupid mistake," admitted it was a breach of the BGN LLC Agreement, and admitted that he was asked several times to return the $1 million. But Chen also testified that the diversion of funds was fair in view of Givaudan's decision to work with ███. Tr. 257, 282-283, 286-287.

68.     Chen testified that his justification for transferring the funds without authority was that Givaudan knew that Conagen was good at scaling up manufacturing capabilities and Givaudan "gave these things to [Conagen's] competitor." Tr. 257.

69.     Chen also testified that he made the transfer because he felt betrayed that "Givaudan didn't choose Conagen as the scale-up and manufacturing partner" and instead gave the opportunity to ███. Tr. 282.

70.     This testimony, however, is at odds with the evidence that Givaudan did actually hope to engage Conagen precisely as the scale-up and manufacturing partner for the ███████

16

project.

71.    Yu testified that he had not been aware until the time of Yu's testimony that Chen had caused BGN to pay Conagen $1 million. Yu agreed that Chen's transfer constituted a violation of the BGN LLC Agreement. Tr. 205-207.

72.    In September 2017, Chen met with Thoen and several other Givaudan representatives in Switzerland in an attempt to resolve several outstanding issues between Givaudan and Chen. Tr. 66-68.

73.    After the meeting, Givaudan employee Maria Tavares emailed Chen a draft of minutes from the meeting for Chen's review and approval. DX-48, with attachment DX-47; Tr. 77-82.

74.    The draft minutes included items 6 and 7, which stated:

6. The Green Note 1—███████████  project, where the initial discovery project phase has been developed with ███████, will be transferred to Conagen for further scale up and commercialization.

7. BGN will not invest, for the time being, on any other ████████████ activities, besides those derived from the previous point (6); it is understood that the 1mioUSD payment made to Conagen with respect to research linked to Green Note 1—███████████ was in breach of the BGN Tech LLC Agreement and must be returned. Failing repayment, Givaudan reserve all rights to trigger dissolution of BGN Tech Ltd as per letter dated 09 August 2017 notifying material breach.

DX-47 at BCCONAGEN000229; Tr. 285-286.

75.    Thoen testified that item 7 accurately reflected Chen's statement during the meeting that Chen would indeed

return the $1 million amount to BGN by early 2018. Tr. 83-84.

76.   Chen replied to Tavares's email stating: "Many thanks for your attachment that looks like tailor made by your legal counsel. I will follow up with the same procedure to reflect what I Exactly said in the meeting as so-called 'meeting minutes'." PTX-73.

77.   Tavares replied: "Undoubtedly, you should follow the procedure you find appropriate to revise [the minutes], and add what you believe is missing or suggest modifications where you disagree with the wording. All I can say is that I look forward to receiving your feedback so together we can move forward." PTX-73.

78.   In a later email in that same exchange, Tavares wrote: "Steven, great talking to you over the phone. Thank you for your time. It was good to hear that we remain aligned on the outcome of the meeting on the 6th: that we want to continue with our business relationship and BGN collaboration." Chen acknowledged the email by thanking Tavares for her call. PTX-73.

79.   Although Chen testified generally that the meeting minutes were inaccurate, Tr. 283-284, there is no evidence that Chen contemporaneously provided any suggested revisions or additions to the meeting minutes.

80.   A separate set of meeting minutes, which documented a

18

BGN board meeting in December 2017, states: "Conagen will reimburse BGN on a previous payment of $1,000,000 for the ▉▉▉▉▉▉▉▉▉ project by the end of January 2018." PTX-50 at GIV0000254; Tr. 204-206.

81.   Yu confirmed that it remained Conagen's intention to be the scale-up partner for the ▉▉▉▉▉▉ project as of December 2017. PTX-50 at GIV0000252; Tr. 204-205.

82.   In January 2018, Conagen submitted a "Technology Transfer and Scale Up Proposal" to Givaudan. DX-73; Tr. 216.

83.   To date, Chen has not returned the $1 million, which is now among the subjects of the BGN dissolution process being overseen by a Court-appointed trustee. Tr. 84. That $1 million is not sought in this case or in the companion case.

### VI. Givaudan's Disclosure of Information to ▉▉▉▉

84.   The plaintiffs initially alleged that Givaudan disclosed Conagen's trade secrets with respect to three categories of compounds: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ In the briefing on the motion for summary judgment, and during oral argument, the plaintiffs dropped their arguments with respect to ▉▉▉▉▉▉▉▉▉▉ but maintained that Givaudan improperly disclosed to ▉▉▉ confidential trade secret information relating to ▉▉▉▉▉▉▉. See ECF No. 89 at 29-30.

85.   The plaintiffs' basis for this claim is a series of

emails between Givaudan and ███████ from January 11, 2018 to February 4, 2018, which the plaintiffs allege reflects a disclosure of Conagen's trade secrets and confidential information to ██████ See DX-66.

86.   The email exchange shows that ████████ representatives questioned Givaudan representatives about the plaintiffs' capabilities, █████████████████████████████████████ ████████████████████ and that Givaudan provided ██████ with some information and stated that it would obtain the remaining information from Conagen. DX-66.

87.   Kleman testified that this type of request by ████████ is routine during process design when working with external manufacturers because the transmission of such information is necessary to ensure that the process and the manufacturing facility are compatible. Tr. 341, 348-349, 358-359.

88.   Yu testified that in checking his calendar, he identified a meeting with Givaudan on January 10, 2018, a day prior to the first email in the exchange between ██████ and Givaudan. DX-66 at GIV0002792-2793; Tr. 181-183.

89.   Yu also testified, however, that he had no recollection of that meeting. Tr. 212-215, 227-229.

90.   Yu testified regarding Givaudan's disclosure to ████████ that Conagen preferred ████████████████████████████████████

█████████████████████████████████████████████████ <u>See</u>

DX-66 at GIV0002791. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ Tr. 183-184. Yu said

that this information was based on Conagen's experience, was not

freely available, and was not something he was eager to share

with a competitor. Tr. 183-184, 188-189.

91.   Kleman testified that there is nothing necessarily

unique about the ███████████ disclosed by Givaudan to █████,

and that ████████████████████████████████████

████████████. Kleman testified that in general, ███████████

█████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████. Tr. 345-346.

92.   Yu also testified regarding Givaudan's disclosure to

████ about the █████████████████████████████████

<u>See</u> DX-66 at GIV0002789. Although the email to ████ states

only that that a █████████████████████████████ would

be acceptable, Yu discussed the purportedly unusual qualities of

Conagen's █████████████. Tr. 191-195, 198.

21

93.   Yu confirmed on cross-examination that the ███████ he described was ███████████████████████████████████ ███████████. Tr. 233-234.

94.   Kleman testified that it is not unusual in his experience for a manufacturer to have ███████████████. He also testified that ███████████████ are not unusual █ ███████████, and that ███████████████ are not necessary to accommodate ███████████████████ ███████████. Tr. 354-356.

95.   Yu did not identify any other information in the ███ email exchange as having come from, or being proprietary to, Conagen. Tr. 188-198, 222-229.

96.   In the final email dated February 4, 2018, Yinming Du of Givaudan wrote to ████████████████████ that Du would have to confirm several additional pieces of information with Conagen. DX-66 at GIV0002789. There is no evidence that any such confirmation was forthcoming or provided to ███████.

97.   At the time of these email exchanges, the plaintiffs knew for approximately six months (since the July 2017 disclosure) of ███████ involvement with Givaudan and with the ███████████ project. Tr. 110.

98.   The evidence supports the conclusion that Conagen was aware of and in agreement with Givaudan's purpose – that is, to

22

collaborate with ███ and Conagen to scale up the ████████ production process with the characteristics and capabilities of Conagen's facility in mind – at the time of the email exchanges between Givaudan and ██████ The information in the email exchange appears to be directly relevant to ██████ work on the development of the first stages of ████████ production that would eventually be manufactured in Conagen's facilities.

**VII. The Termination of the Green Note 1 Project**

99.   The broader relationship between Givaudan and Chen's companies, including the plaintiffs, deteriorated between 2017 and into early 2018. Tr. 84-85.

100.   There were several factors that contributed to the deterioration of the relationship between Givaudan and Conagen. These included Conagen's unhappiness with Givaudan's decision to turn to █████ for the initial development of ████████ and Conagen's unhappiness with Givaudan's decision in November 2016, not to invest in two of Chen's other companies, SweeGen International Limited ("SweeGen") and Anhui Longjin Bio-Technology Co., Ltd. ("Anhui"). See Tr. 122, 279.

101.   In June 2017, Givaudan demanded the return of its $20 million investment in Conagen. DX-11. In the summer of 2017, Chen caused $1 million to be transferred from BGN to Conagen in violation of the BGN LLC Agreement. In September 2017, Chen met

with Givaudan representatives and discussed the various contentious issues between the parties including the dispute over Givaudan's investment in Conagen and Chen's diversion of $1 million from BGN.

102.   Meanwhile, the ███████████ project was proceeding with █████ developing the strain that was ultimately going to be used by Conagen to manufacture ████████. Given the strained relations between Givaudan and Conagen and Conagen's aversion to █████, despite Conagen's knowledge of ███████ involvement in the development of ████████, it is understandable that Givaudan did not copy Conagen on █████ requests for information in the email exchange from January 11, 2018 to February 4, 2018, and instead obtained information from Conagen and conveyed it to ████.

103.   By late in the first quarter or early in the second quarter of 2018, Givaudan had elected to suspend its efforts with respect to Green Note 1 based on the issues described above. Givaudan ultimately terminated its relationship with Chen and his companies. Tr. 85-86.

104.   Instead, Givaudan engaged █████ as its scale-up and manufacturing partner for the ████████ project, with ██████ as ██████ contract manufacturer. Tr. 372.

105.   As of May 2022, █████ has sold █████████

24

████████ of ██████████████████████ manufactured by ████
to Givaudan for a total price of ████████████████████
████ PTX-67, PTX-68, PTX-69, PTX-70, PTX-71, PTX-72.

106.   There is no credible evidence that any of the information in the January and February 2018 email exchange about Conagen's manufacturing process that would have been used for the manufacturing of ████████ has been used by Givaudan or any other party in the production of ████████

## CONCLUSIONS OF LAW

### I. Standards for Demonstrating the Existence of a Trade Secret

1.    The plaintiffs assert three causes of action. The first is for trade secret misappropriation under the DTSA. The plaintiffs assert a second cause of action for trade secret misappropriation under the DUTSA. Finally, the plaintiffs assert a breach of contract claim for Givaudan's alleged breach of the BGN LLC Agreement's confidentiality provisions.

2.    The DTSA defines a trade secret as information that "derives independent economic value, actual or potential, from not being generally known to[] and not being readily ascertainable through proper means" by another and that the owner has undertaken "reasonable" efforts to keep secret. 18 U.S.C. § 1839(3)(A)-(B).

3.    Trade secret misappropriation claims brought under

Delaware law are governed by the DUTSA. DUTSA defines a trade

secret, in essentially the same manner as the DTSA, as:

> information, including a formula, pattern, compilation,
> program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other
> persons who can obtain economic value from its
> disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under
> the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).

4.    The definition of "trade secret" in the BGN LLC

Agreement is functionally identical to the definitions under the

DTSA and the DUTSA.

5.    The DTSA requires a plaintiff claiming trade secret

misappropriation to identify with specificity the information

that the plaintiff claims to be a trade secret. Zirvi v.

Flatley, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020), aff'd, 838 F.

App'x 582 (2d Cir. 2020); see also Sit-Up Ltd. v.

IAC/InterActiveCorp., No. 05-cv-9292, 2008 WL 463884, at *10-11

(S.D.N.Y. Feb. 20, 2008); Big Vision Priv. Ltd. v. E.I. DuPont

De Nemours & Co., 1 F. Supp. 3d 224, 258 (S.D.N.Y. 2014), aff'd,

610 F. App'x 69 (2d Cir. 2015).

6.    The DUTSA requires a similar showing of specificity.

See, e.g., Savor, Inc. v. FMR Corp., No. 00C-10-149, 2004 WL

1965869, at *6 (Del. Super. Ct. July 15, 2004).

7.    "A trade secret, by definition, must have economic value and provide a competitive advantage due to the exclusive use of a product or technique." Zirvi, 433 F. Supp. 3d at 448.

8.    "Information that is public knowledge or that is generally known in an industry cannot be a trade secret." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984).

## II. Misappropriation and Trade Secret Damages

9.    Under the DTSA, misappropriation of a trade secret can include "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5). The DUTSA includes a substantially identical provision. Del. C. § 2001(2).

10.   To recover damages for trade secret misappropriation, a plaintiff must demonstrate that it suffered damages attributable to the alleged misappropriation and that those damages are calculable beyond mere speculation. See ScentSational Techs., LLC v. PepsiCo, Inc., No. 13-cv-8645, 2017 WL 4403308, at *16 (S.D.N.Y. Oct. 2, 2017).

11.   Specifically, under the DTSA, the Court may award damages for the actual loss caused by the misappropriation, along with damages for any unjust enrichment caused by the misappropriation that is not addressed by the computation of actual loss. Alternatively, the Court may award damages caused by the misappropriation measured by the imposition of a reasonable royalty. 18 U.S.C. § 1836(b)(3)(B).

12.   The measures of damages under the DUTSA similarly include (i) actual loss caused by misappropriation and unjust enrichment caused by misappropriation and not accounted for in actual loss, or (ii) damages caused by misappropriation as measured by a reasonable royalty. 6 Del. C. § 2003.

### III. Breach of Contract

13.   The BGN LLC Agreement has a Delaware choice of law provision, DX-49 at BLUECAL9033-000061, and the parties do not dispute that Delaware law governs the plaintiffs' breach of contract claim.

14.   Under Delaware law, to prove a breach of contract claim, the plaintiff must establish: "(1) the existence of a contract, (2) a breach of the contract, (3) and that the breach of the contract was the proximate cause of damages." Johnson v. Gov't Emps. Ins. Co., No. 06-cv-408, 2014 WL 2708300, at *1 (D. Del. June 16, 2014), aff'd sub nom. Johnson v. GEICO

Cas. Co., 672 F. App'x 150 (3d Cir. 2016) (citing VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003)).

**IV. The Plaintiffs Have Not Demonstrated that Givaudan Misappropriated a Trade Secret**

15.   Although the plaintiffs may have been offended by Givaudan's collaboration with ████ nothing about that collaboration violated the BGN LLC Agreement, which at Section 11.01 expressly contemplated and permitted outside activity even to the extent competitive with BGN or a Member.

16.   Givaudan collaborated with ████ on a project to produce ████████ which was a product to be used by Givaudan and Givaudan did so because ████ was prepared to bear the upfront costs of development.

17.   The only information that Yu identified in the ████ email exchange as having come from and/or being proprietary to Conagen is (i) Conagen's preference for ████████ ████████████████████, and (ii) ████████████████████

18.   Givaudan has adduced credible evidence that Conagen's ████████████████████ ████████████ is a standard consideration and strategy in the industry.

19.   Likewise, Givaudan has adduced credible evidence that the ████████████████████ is

29

not unique, and the plaintiffs have not provided evidence that
such capability is unusual or of competitive value.

20.    Additionally, the plaintiffs have not demonstrated
that any of the information in the emails from Givaudan to
███████    whether or not it was secret, was used by Givaudan,
██████  or any other party to their advantage, or at all.

21.    The plaintiffs have also failed to demonstrate that
the alleged trade secrets give Conagen any unique industry
standing, has been successfully licensed, enables greater
efficiency, departs from industry standards, or was developed at
a significant expenditure of effort and/or expense. The
plaintiffs have failed to make any showing that this information
is economically valuable or provides Conagen or any potential
recipient of the information with any competitive advantage.

22.    In sum, in the absence of a showing that the
information disclosed by Givaudan has economic value based on
any secrecy it may enjoy, the plaintiffs' assertion that the
information disclosed to ███████ constitutes trade secrets fails,
and therefore the plaintiffs' claim for trade secret
misappropriation based on the disclosure of this information
fails.

**V. The Plaintiffs Have Not Demonstrated any Damages Caused by
Givaudan's Alleged Misappropriation**

23.    The plaintiffs have also failed to carry their burden

30

of demonstrating that any alleged misappropriation by Givaudan caused the plaintiffs to suffer any damages, whether measured by lost profits, unjust enrichment, reasonable royalty, or any other measure. There is no evidence in the record to support any finding of damages. All the plaintiffs' damages calculations are based on speculation laid upon speculation.

24.   Givaudan's witnesses testified that the parties elected not to go forward with Conagen on the Green Note 1 scale-up work due to the breakdown of the broader relationship between Chen and Givaudan. The plaintiffs have not disputed this testimony. As a result, the alleged misappropriation did not cause Conagen to lose any benefit that it might have realized through the scale-up work and manufacturing.

25.   The plaintiffs' alternative damages theory based on a "reasonable royalty" for the misappropriator's unauthorized disclosure or use of a trade secret, 18 U.S.C. § 1836(b)(3)(B)(ii), is completely speculative and unhinged from the evidence in the case. There is no evidence that the information from the January to February 2018 email exchange was in fact used by Givaudan, ████████ or anyone else. There is also no evidence that anyone would be prepared to pay anything for the items in that email exchange.

26.   The fact that there is no evidence that ██████ or any

other party used any of Conagen's alleged trade secrets lends
further support to the conclusion that the information was not
economically valuable and that Givaudan's disclosure of the
information to ███████ did not cause the plaintiffs to suffer any
damages.

## VI. The Plaintiffs Have Not Demonstrated that Givaudan's Breach of the BGN LLC Agreement Caused any Actual Damages

27.     The plaintiffs allege that Givaudan breached the
confidentiality provision of the BGN LLN Agreement. In its
proposed findings of fact and conclusions of law, Givaudan does
not contest that its disclosure of information to ██████ in the
January and February 2018 email exchange constituted a breach of
the confidentiality provision of the BGN LLC Agreement. Givaudan
only argues that the plaintiffs have failed to prove that
Givaudan's breach of the BGN LLC Agreement caused the plaintiffs
to suffer any actual damages.

28.     For the same reasons explained above with respect to
the plaintiffs' claims for trade secret misappropriation, the
plaintiffs have failed to prove that Givaudan's disclosure of
information to ██████ caused the plaintiffs to suffer any
damages. Accordingly, the plaintiffs may not recover any
compensatory damages for Givaudan's breach of the BGN LLC
Agreement.

29.     The plaintiffs argue that irrespective of whether they

have shown that they suffered actual damages from Givaudan's breach of the BGN LLC Agreement, the plaintiffs are entitled to an award of nominal damages. Givaudan did not address the plaintiffs' request for nominal damages in its proposed findings of fact and conclusions of law.

30.   Under Delaware law, a party may recover nominal damages for a breach of contract "even if compensatory damages cannot be or have not been demonstrated." Enzo Life Scis., Inc. v. Adipogen Corp., 82 F. Supp. 3d 568, 607 (D. Del. 2015) (quoting Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC, No. 3158, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009)). Because the plaintiffs adduced evidence that Givaudan breached the confidentiality provision of the BGN LLC Agreement and because Givaudan does not contest that it breached that contract, the plaintiffs are entitled to nominal damages in the amount of $1. See, e.g., id. (awarding nominal damages where a defendant "breached [a] confidentiality clause" but the plaintiff "was not able to establish that it suffered any damage as a result of the breach.").[2]

---

[2] In their proposed findings of fact and conclusions of law, the plaintiffs argue that Givaudan also breached the June 2017 Mutual Confidentiality Agreement between Conagen and Givaudan. See DX-68. However, in their complaint, the plaintiffs did not discuss the 2017 Mutual Confidentiality Agreement and did not allege that Givaudan breached that contract. See Compl. ¶¶ 65-78 (claiming only that Givaudan breached the BGN LLC Agreement). Accordingly, any claim by the plaintiffs that Givaudan breached the 2017

## CONCLUSION

The plaintiffs have failed to prove that Givaudan is liable for trade secret misappropriation under the DTSA or the DUTSA. Therefore, the plaintiffs' causes of action for trade secret misappropriation under the DTSA and the DUTSA are dismissed with prejudice.

Although the plaintiffs demonstrated that Givaudan breached the BGN LLC Agreement, the plaintiffs failed to prove that Givaudan's conduct caused the plaintiffs to suffer any damages. Accordingly, Givaudan is liable to the plaintiffs for $1 in nominal damages.

The Clerk is directed to enter an appropriate judgment. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

**Dated:**      **New York, New York**
             **July 18, 2022**

                                         John G. Koeltl
                                  **United States District Judge**

---

Mutual Confidentiality Agreement is not properly before the Court and is dismissed.