**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**PHYTO TECH CORP. d/b/a BLUE**
**CALIFORNIA, ET AL.,**

                        **Plaintiffs,**

        **- against -**

**GIVAUDAN SA,**

                        **Defendant.**
────────────────────────────────

**18-cv-6172 (JGK)**

**MEMORANDUM OPINION**
**AND ORDER**

**JOHN G. KOELTL, District Judge:**

The plaintiffs, Phyto Tech Corp. d/b/a Blue California ("Blue Cal") and Conagen Inc. ("Conagen"), brought this action against Givaudan SA ("Givaudan"), alleging (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and the Delaware Uniform Trade Secrets Act ("DUTSA"), Del. Code Ann. tit. 6, § 2001 et seq., and (2) breach of contract. The contract claim arose out of an alleged violation of a confidentiality provision in an agreement creating BGN Tech LLC ("BGN"), a joint venture between Blue Cal and Givaudan (the "BGN LLC Agreement" or "Agreement").

In June 2022, this Court held a four-day non-jury trial to resolve the claims in this action and in the previously filed case of Givaudan SA v. Conagen Inc., No. 18-cv-3588 (S.D.N.Y. July 19, 2022) (the "Term Sheet Case"). In the earlier case, Givaudan sought to recover $10 million that it had provided to Conagen. On July 22, 2022, the Court issued a Memorandum Opinion

and Order concluding that (1) the plaintiffs' misappropriation claims failed, and (2) the plaintiffs demonstrated Givaudan's breach of the BGN LLC Agreement, but failed to show that this breach resulted in damages. See Phyto Tech Corp. v. Givaudan SA, No. 18-cv-6172, 2022 WL 2905515 (S.D.N.Y. July 22, 2022) ("Bench Trial Order"). The Court accordingly awarded the plaintiffs $1 in nominal damages solely on the contract claim. See id. at *13. In a separate opinion, the Court also rejected Givaudan's effort to recoup the $10 million that it had provided to Conagen. See Givaudan SA v. Conagen Inc., No. 18-cv-3588, 2022 WL 2804983, at *9 (S.D.N.Y. July 18, 2022).

The plaintiffs now seek attorneys' fees and expenses in an amount totaling $675,176.87. For the reasons set forth below, the plaintiffs' motion is **granted**, but the amount of fees and expenses awarded is reduced to **$105,882.91**.

I.

The Court assumes familiarity with the Bench Trial Order, which sets forth the facts of this litigation in detail. See 2022 WL 2905515, at *1-9. The following facts are taken from the Bench Trial Order and from the parties' submissions.[1]

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

**A.**

Blue Cal is a corporation in the business of researching, developing, and manufacturing natural ingredients. Bench Trial Order, 2022 WL 2905515, at *1. Conagen, a Blue Cal affiliate, is an entity focused on discovery and commercialization of materials through organic and biosynthetic pathways. See id. Givaudan is a Swiss corporation that sells flavors and fragrances to industry customers. Id. In 2014, Blue Cal and Givaudan entered into the BGN LLC Agreement, which established BGN as a joint venture. See id. at *2. The Agreement provided that Givaudan would contribute capital and certain intellectual property ("IP") and that Blue Cal would contribute IP concerning three specific ingredients. See id. The Agreement also contained a confidentiality provision that required the parties to keep confidential any information "from or regarding the other Member (or its Affiliates) or [BGN] in the nature of trade secrets or that otherwise is confidential . . . ('Confidential Information'), the release or disclosure of which could be damaging to the other Member (or its Affiliates)." Id. (quoting § 12.01(a) of the BGN LLC Agreement).

On July 6, 2018, the plaintiffs filed their complaint against Givaudan, seeking damages for misappropriation of trade secrets and breach of contract. Compl., ECF No. 1, at ¶¶ 2, 78.[2]

---

[2] Unless otherwise noted, all citations to ECF refer to the docket in this action, No. 18-cv-6172.

The complaint alleged that Conagen was an "Affiliate" of Blue
Cal within the meaning of the BGN LLC Agreement, that Conagen
had shared with Givaudan certain proprietary information about
its "research, development, and scale up production efforts"
for three biosynthetic compounds of interest, and that Givaudan
wrongfully disclosed that proprietary information to ████
████████████████ a BGN competitor, in violation of
federal and state trade-secrets laws and the BGN LLC Agreement's
confidentiality provision. Id. ¶¶ 16, 21-24, 25, 28-29, 38-77.

Givaudan filed its answer to the complaint on October 29,
2018, see ECF No. 21, and discovery ensued. Counsel for Blue Cal
and Conagen prepared interrogatories and subpoenas, deposed one
Givaudan witness, defended the deposition of a Conagen witness,
and reviewed over 20,000 documents. See Helm Decl., ECF No. 149,
at ¶ 14. On September 11, 2020, Givaudan brought a motion for
summary judgment. See ECF No. 43. The plaintiffs opposed the
motion, although they dropped their arguments regarding two of
the three biosynthetic ingredients identified in the complaint
and maintained only that Givaudan had disclosed confidential
trade secret information about the third compound, ██████████ .
See ECF No. 61; Bench Trial Order, 2022 WL 2905515, at *7. The
Court denied the summary judgment motion in July 2021. See ECF
No. 86.

The case proceeded to trial. Over the course of four days in June 2022, counsel for the parties presented evidence and argument related to the plaintiffs' claims in this case and to Givaudan's claims in the Term Sheet Case. See ECF Nos. 117, 119-20, 122, 124. Counsel for the plaintiffs subsequently filed a posttrial memorandum and responded to Givaudan's posttrial briefing. See ECF Nos. 130, 136; Helm Decl. ¶ 18.

On July 22, 2022, this Court issued the Bench Trial Order setting forth its findings of fact and conclusions of law with respect to the plaintiffs' claims. As described in the Order, the evidence at trial established that Givaudan had contracted with ███████ to produce ████████████, and that Conagen, in spite of its displeasure with Givaudan's choice to engage ██████ in the ████████████████████████████, intended to serve as the partner responsible for "scaling up" production of that compound. See Bench Trial Order, 2022 WL 2905515, at *4-7. The evidence also established that in a series of emails exchanged between January and February 2018, Givaudan disclosed to ██████ certain confidential information concerning Conagen's methods for producing ████████ at a large scale. Id. at *7-8.

However, as explained in the Bench Trial Order, Blue Cal and Conagen "failed to make any showing" that the information disclosed in Givaudan's emails was "economically valuable or provide[d] Conagen or any potential recipient of the information

with any competitive advantage." Id. at *11. Thus, the plaintiffs could not establish that Givaudan had disclosed trade secrets to █████, and the claims of trade-secret misappropriation failed. See id. The Court also found that the plaintiffs could not show damages arising from the alleged misappropriation in any event. To the contrary, "[a]ll the plaintiffs' damages calculations [were] based on speculation laid upon speculation." Id.

    As for the contract claim, Givaudan did not dispute the plaintiffs' trial evidence establishing "that its disclosure of information to █████ in the January and February 2018 email exchange constituted a breach of the confidentiality provision of the BGN LLC Agreement." Id. at *12. However, the Court found that "[f]or the same reasons explained" with respect to the two trade-secrets claims, "the plaintiffs have failed to prove that Givaudan's disclosure of information to █████ caused . . . any damages." Id. "Accordingly, the plaintiffs [could] not recover any compensatory damages for Givaudan's breach of the BGN LLC Agreement." Id. Instead, under Delaware law, the plaintiffs were "entitled to nominal damages in the amount of $1." Id. On July 26, 2022, the Court entered judgment dismissing the trade-secret misappropriation claims and awarding $1 in nominal damages on the contract claim. See ECF No. 146.

**B.**

The plaintiffs now seek attorneys' fees and costs totaling $675,176.87, which encompasses $638,823.98 in fees and $36,352.89 in other expenses, in connection with the breach of contract claim for which the plaintiffs recovered $1. See Pls.' Memo. of Law, ECF No. 148, at 7.

The plaintiffs were represented in this action by Dechert LLP ("Dechert"). Helm Decl. ¶ 6. Dechert provided the plaintiffs with a 15-percent discount on the hourly rates charged for each timekeeper's services in connection with the representation. See id. ¶ 22. The plaintiffs' litigation team included two partners, Katherine Helm and Martin J. Black. Helm is a litigator with more than ten years of experience in intellectual property law and trial advocacy. See id. ¶ 6. Over the course of the litigation (from May 2018 to July 2022), Helm billed for her services at a "discounted" rate that "increased incrementally" from $828.75 to $1,147.50 per hour. Id. Black, a trial lawyer with more than three decades of experience in trade secret and intellectual property disputes, billed at a discounted rate that increased from $845.75 to $1,275 per hour during the same period. See id. ¶ 7.

The plaintiffs' Dechert team also included three associates and one senior paralegal, whose discounted billing rates likewise increased over the course of their involvement in the litigation. Associates Luke Reilly, Charles Hsu, and Sarah Lyons billed at

discounted rates that fell within a range of $416.50 to $862.75 per hour. See id. ¶¶ 8-10. For senior paralegal Sarah Rattle, the discounted rate ranged from $276.25 to $369.75 per hour. See id. ¶ 11.

This case is one of five separate actions in which the same Dechert attorneys represented the "Blue Cal family of companies" against Givaudan. Id. ¶ 21. The other actions included one case filed in California state court, another filed in New York state court, and two additional cases filed in this Court, which were the Term Sheet Case (filed in April 2018) and Phyto Tech Corp. d/b/a/ Blue California v. Givaudan SA, No. 19-cv-9033 (S.D.N.Y. filed Sept. 27, 2019) ("Liquidation Case"). Rather than billing for these matters on a case-by-case basis, Dechert provided "the client . . . with a single monthly invoice containing time entries for work performed in each of the [five] litigations." Helm Decl. ¶ 22. The time entries in those monthly invoices "did not explicitly apportion the hours by each of the individual cases." Id.

Dechert now seeks fees and costs for the work performed solely in connection with obtaining a favorable judgment on the breach of contract claim in this litigation. To prepare its fee application, Dechert reviewed all of the monthly invoices for the five related actions and excluded any time entries "that did not involve work relating to this case." Id. ¶ 23. Dechert then split

the remaining time entries "into three categories based on the timekeepers' narratives": Category 1 contains time entries for work performed only on this case, encompassing work on both the two trade-secret misappropriation claims and the contract claim; Category 2 contains time entries for work performed on this case as well as the Term Sheet Case, which was consolidated with this action for trial; and Category 3 contains time entries for work performed "generally across all [five] Blue Cal and Givaudan actions." Id. ¶¶ 26, 30, 34. Next, Dechert calculated the total amount of attorneys' fees paid per category (taking into account the 15-percent discount afforded to the client), then multiplied each total by Dechert's own category-specific "estimate of the percentage of billed time attributable to obtaining the judgment" on the contract claim in this action. Id. ¶ 24. In particular, the plaintiffs now seek 50% of the fees in Category 1, 33% of the fees in Category 2, and 25% of the fees in Category 3, amounting to $638,823.98 in attorneys' fees supposedly incurred for work performed only in litigating the contract claim.

The following charts correspond to each of Dechert's three categories of time entries purportedly describing at least some work related to this action. Each chart lists the hours billed per timekeeper, the average discounted hourly rate per timekeeper (presumably reflecting the average of each timekeeper's discounted hourly rates as they increased over the time period in which the

relevant work was performed), the total discounted fees paid, and the requested apportionment of fees:

| Category 1 Time Entries | | | | |
|---|---|---|---|---|
| Timekeeper | Hours | Average Discounted Hourly Rate | Discounted Amount Paid by Client | Requested Fees with 50% Apportionment |
| Helm | 101.75 | $914.43 | $93,043.76 | $46,521.88 |
| Black | 13.9 | $1,015.44 | $14,114.68 | $7,057.34 |
| Reilly | 113.5 | $598.30 | $67,907.24 | $33,953.62 |
| Hsu | 92 | $499.10 | $45,917.10 | $22,958.55 |
| **Total** | **321.15** | -- | **$220,982.78** | **$110,491.39** |
| Source: Helm Decl. ¶ 27 | | | | |

| Category 2 Time Entries | | | | |
|---|---|---|---|---|
| Timekeeper | Hours | Average Discounted Hourly Rate | Discounted Amount Paid by Client | Requested Fees with 33% Apportionment |
| Helm | 424.6 | $928.45 | $394,217.87 | $130,091.90 |
| Black | 358.8 | $1,079.97 | $387,492.70 | $127,872.59 |
| Reilly | 705.16 | $669.02 | $471,768.76 | $155,683.69 |
| Hsu | 248 | $570.34 | $141,444.89 | $46,676.81 |
| Rattle | 167.18 | $310.39 | $51,890.94 | $17,124.01 |
| **Total** | **1903.74** | -- | **$1,446,815.15** | **$477,449.00** |
| Source: Helm Decl. ¶ 31 | | | | |

| Category 3 Time Entries | | | | |
|---|---|---|---|---|
| Timekeeper | Hours | Average Discounted Hourly Rate | Discounted Amount Paid by Client | Requested Fees with 25% Apportionment |
| Helm | 118.2 | $897.50 | $106,084.48 | $26,521.12 |
| Black | 15.7 | $1,002.11 | $15,733.08 | $3,933.27 |
| Reilly | 89.98 | $555.64 | $49,996.73 | $12,499.18 |
| Hsu | 10.3 | $465.97 | $4,799.53 | $1,199.88 |
| Lyons | 36.8 | $723.39 | $26,620.73 | $6,655.18 |
| Rattle | 1.07 | $280.22 | $299.84 | $74.96 |
| **Total** | **272.05** | -- | **$203,534.37** | **$50,883.59** |
| Source: Helm Decl. ¶ 35 | | | | |

The plaintiffs also request related nontaxable expenses of $36,352.89, a value reflecting Dechert's estimation that 25% of the expenses paid across all five actions (totaling $145,411.57)

were "devoted to obtaining a favorable judgment" on the contract claim in this litigation. Id. ¶ 41.

Overall, the plaintiffs ask this Court for an award of $675,176.87 in fees and expenses. Givaudan opposes this request.

**II.**

As a threshold matter, the parties dispute whether the plaintiffs qualify as "prevailing parties" in this litigation. The plaintiffs argue that the favorable judgment on the contract claim renders Blue Cal a "prevailing party" under the terms of the BGN LLC Agreement, which provides for a fee award in breach of contract cases. Givaudan contends that the plaintiffs are not entitled to fees and costs because they failed to prove actual damages for their contract claim and generally lost on their remaining causes of action. On this issue, the plaintiffs' position is more persuasive.

The plaintiffs seek fees pursuant to the BGN LLC Agreement, which contains the following provision regarding "violation[s] of [the] Agreement":

> [T]he non-breaching party may bring an action on their own or on behalf of [BGN] against the breaching parties with respect to any breach or bring any action as may be permitted to recover damages on behalf of [BGN] or the non-breaching party. In any such proceeding or action, the <u>prevailing party or parties shall be entitled to receive from the non-prevailing party or parties, in addition to such other damages and relief as may be awarded, the costs and expenses incurred by it or them in connection with such action, including reasonable attorneys' fees</u>.

11

BGN LLC Agreement, ECF No. 152-1, § 14.07. The Agreement also contains a Delaware choice-of-law provision, see id. § 14.10, and both sides cite Delaware cases to support their respective arguments on the "prevailing party" issue. Thus, Delaware law governs the question of whether the plaintiffs are entitled to an award of attorneys' fees and costs under the terms of the Agreement. See Krumme v. Westpoint Stevens, 238 F.3d 133, 138 (2d Cir. 2000) (where the parties' submissions rely on the same body of state law, such "implied consent . . . is sufficient to establish choice of law").

"Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs." Mahani v. Edix Media Grp., 935 A.2d 242, 245 (Del. 2007). But "[a]n exception to this rule is found in contract litigation that involves a fee[-]shifting provision." Id. If the contract at issue in an action "contains a fee-shifting provision, [the Delaware courts] will enforce that provision." SIGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 352 (Del. 2013). And where the text of a fee-shifting provision is clear and unambiguous, courts must give that text its plain and ordinary meaning. See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund, 68 A.3d 665, 683 (Del. 2013).

In this case, the plain language of the BGN LLC Agreement provides for an award of "reasonable attorneys' fees" and other

litigation costs to any "prevailing party" in an action for a breach of the Agreement, irrespective of whether that party secures a compensatory damages award. See BGN LLC Agreement, § 14.07. Section 14.07 of the Agreement states that such fees will be awarded to the "prevailing party" in an action "with respect to any breach or [in] any action as may be permitted to recover damages on behalf of [BGN] or the non-breaching party." Id. (emphasis added). This use of the conjunctive "or" makes clear that the parties' fee-shifting provision applies to any action concerning a breach of the Agreement, whether or not that action seeks damages. And the provision also states that the prevailing party is entitled to fees "in addition to such other damages and relief as may be awarded," id. (emphasis added), which likewise indicates that a party need not obtain compensatory damages to qualify as a prevailing party.

Indeed, "having chosen the common term 'prevailing party,' the parties can be presumed to have intended that the term would be applied . . . as [the Delaware courts] have traditionally done so." Comrie v. Enterasys Networks, Inc., No. 19254, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004). And "Delaware law is clear that in the usual case, and absent contractual language to the contrary, whether a party has prevailed is determined by looking at the outcome of the substantive issues, not damages." Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC, No. 3158,

2009 WL 1111179, at *14 (Del. Ch. Apr. 27, 2009); West Willow-Bay v. Robino-Bay Court Plaza, LLC, No. 2742, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009). Consistent with this principle, Delaware courts applying similar fee-shifting provisions have awarded fees to parties who proved a breach of the contract at issue but secured only nominal damages. See, e.g., Ivize, 2009 WL 1111179, at *1 (plaintiff was "entitled to attorneys' fees" under a fee-shifting provision "because [plaintiff] prevailed on [a] breach of contract claim" for which it obtained "only nominal damages"); SinoMab Bioscience Ltd. v. Immunomedics, Inc., No. 2471, 2009 WL 1707891, at *1, *17 (Del. Ch. June 16, 2009) (plaintiff entitled to "reasonable attorneys' fees" where it received "nominal damages of one dollar" on a contract claim); cf. Comrie, 2004 WL 936505, at *2-3 (plaintiffs entitled to fees where they won "the main issue in the case -- the interpretation of the [contract]," but received only 28% "of the damages the plaintiffs initially sought").

In this case, the plaintiffs succeeded on the merits of the contract claim: they "demonstrated that Givaudan breached the BGN LLC Agreement," Bench Trial Order, 2022 WL 2905515, at *13, and at trial, Givaudan did not contest that its disclosures to ███████ had violated the Agreement's confidentiality provision. Moreover, the fee-shifting provision is devoid of any language suggesting that the parties intended to deviate from the usual

14

interpretation of "prevailing party" under Delaware law. Thus, Blue Cal is a "prevailing party" within the meaning of Section 14.07 of the BGN LLC Agreement, notwithstanding the fact that the plaintiffs obtained only nominal damages for the breach of contract. See Ivize, 2009 WL 1111179, at *14. The plaintiffs are therefore entitled to an award of "reasonable attorneys' fees" and other costs incurred in connection with the contract dispute, pursuant to the mandatory language of Section 14.07.[3] See BGN LLC Agreement, § 14.07 (the "prevailing party" "shall be entitled" to fees and costs (emphasis added)).

Givaudan contends that the plaintiffs are not prevailing parties because they fail to meet the standard of "predominance" in the litigation. Def.'s Opp'n, ECF No. 156, at 1. To support this position, Givaudan points out that the plaintiffs lost on the merits of their trade-secret misappropriation claims and

---

[3] Section 14.07 of the BGN LLC Agreement applies to "[e]ach party," see BGN LLC Agreement, § 14.07, presumably referring to Givaudan, Blue Cal, and BGN (the Agreement's three signatories) but not to Conagen. Thus, it would appear that only Blue Cal is relevant to the "prevailing party" analysis here. However, as a practical matter, an award of fees and expenses to Blue Cal is necessarily an award to Conagen, because the two affiliated entities were jointly represented by Dechert and were billed as a single client. See Helm Decl. ¶¶ 21-22 (Dechert "represented the Blue Cal family of companies" in "five separate litigations" and provided that "client . . . with a single monthly invoice"). In any event, Givaudan does not argue that Conagen cannot share in fees or expenses awarded to Blue Cal pursuant to Section 14.07. Thus, for the sake of simplicity, the Court often refers to "the plaintiffs" as the recipients of the fee award, instead of repeatedly differentiating between Blue Cal and Conagen.

failed to establish damages with respect to any cause of action. See id. at 4-5. It is true that Delaware courts often apply a "predominance in the litigation" standard to "determin[e] . . . the prevailing party," and that this standard entails an inquiry into the parties' relative success on the "main issue[s] in [a] case." Comrie, 2004 WL 936505, at *2. However, because the fee request here is made pursuant to Section 14.07 of the BGN LLC Agreement, which permits fee-shifting only in breach of contract actions, the scope of the "predominance" inquiry is limited to the parties' contract dispute. Indeed, the plaintiffs are clear that they seek "limited, apportioned fee[s]" solely in connection with Dechert's work on the contract claim. Pls.' Reply, ECF No. 159, at 1. Thus, the plaintiffs' failure to prove their trade-secret misappropriation claims has no bearing on the plaintiffs' entitlement to fees under Section 14.07. And with respect to the contract dispute alone, the plaintiffs did "predominate[]" because they succeeded on the main issue -- the existence of a breach.[4] See, e.g., Ivize, 2009 WL 1111179, at *14 (plaintiff won

---

[4] Givaudan cites several Delaware cases to support its position that the plaintiffs did not "predominate" in the litigation, but those cases differ materially from this one. In two of the cases on which Givaudan relies, the fee-shifting provisions at issue expressly authorized the courts to award "fees . . . incurred by [the] part[ies] on an equitable basis," and the courts invoked that equitable authority to deny fee awards to parties who recovered far less than the damages sought. See Great Hill Equity IV, LP v. SIG Growth Equity Fund I, LLLP, No. 7906, 2020 WL 7861336, at *2-3, *6-7 (Del. Ch. Dec. 31, 2020) (finding that

"on the major substantive issues" in contract dispute because, "[w]hile [it] did not prove its damages with the required certainty, it did prove[] [the] breach").

In short, under Section 14.07 of the BGN LLC Agreement and applicable Delaware law, the plaintiffs qualify as "prevailing parties" with regard to their contract claim. Accordingly, the plaintiffs are entitled to an award of attorneys' fees and other litigation costs pursuant to the BGN LLC Agreement.

---

"equity [was] best served by leaving . . . each party to bear its own [fees]" where plaintiffs "were successful in recovery on some [claims], [but] the ultimate damages awarded were minimal"); In re Facchina Constr. Litig., No. N17C-09-163, 2021 WL 1118115, at *2-3 (Del. Super. Ct. Mar. 24, 2021) (finding that "[fee] shifting would not be equitable under the [contract]" where "each party recovered far less than he or it sought"). In contrast, the fee-shifting provision here uses mandatory language rather than equitable language. And in Givaudan's other cases, the courts declined to resolve competing applications for attorneys' fees in favor of one party over the other where (1) each party asserted affirmative claims arising out of the contract in question, and (2) each party enjoyed mixed success on the main issues related to the contract claims. See Vianix Del. LLC v. Nuance Commc'ns., Inc., No. 3801, 2010 WL 3221898, at *29 (Del. Ch. Aug. 13, 2010) (finding no "prevailing party" under fee-shifting provision where both plaintiff and defendant won "on several claims and contentions" related to their respective obligations under the contract); see also Duncan v. STTCPL, LLC, No. K16C-12-020, 2020 WL 829374, at *1, *15-16 (Del. Super. Ct. Feb. 19, 2020) (finding no "prevailing party" under fee-shifting provision where defendant defeated contract-based damages claim, and where plaintiff defeated contract-based indemnification counterclaim). Because Givaudan did not assert any contract claims against the plaintiffs, and because this case does not involve competing claims of entitlement to attorneys' fees under the fee-shifting provision, Vianix and Duncan are inapposite.

17

### III.

Resolving the "prevailing party" issue is only the first step in determining the proper fee award in this case. Under both the express terms of the BGN LLC Agreement and Delaware law, any fees awarded pursuant to the parties' contractual fee-shifting provision must be "reasonable."[5] See BGN LLC Agreement, § 14.07

---

[5] While both parties rely on Delaware law in their respective analyses of the "prevailing party" issue, only Givaudan cites Delaware law in its discussion of whether the requested fee is reasonable. See Def.'s Opp'n at 7. The plaintiffs instead invoke the Second Circuit's "presumptively reasonable fee" method, and they contend that "[t]his principle has been applied to awards of contractual attorneys' fees." Pls.' Memo. of Law at 4. But the decision on which the plaintiffs rely for this proposition, Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C., No. 12-cv-5212, 2016 WL 2745847 (S.D.N.Y. May 11, 2016), awarded fees pursuant to a contract with a choice-of-law provision requiring the application of "federal law and, except as preempted by federal law, the laws of New York." Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C., No. 12-cv-5212, 2015 WL 5752595, at *4 n.4 (S.D.N.Y. Sept. 30, 2015). Here, the BGN LLC Agreement contains a choice-of-law provision stating that "[t]his Agreement and all claims and causes of action . . . shall be governed by and shall be construed in accordance with the laws of the State of Delaware." BGN LLC Agreement, § 14.10. Because the plaintiffs' entitlement to "reasonable attorneys' fees" flows directly from an express provision of the BGN LLC Agreement, see BGN LLC Agreement, §14.07, Delaware law must govern the reasonableness analysis. See F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1263 (2d Cir. 1987) (applying the body of state law "which the [c]ontracts provided was to govern" to determine the reasonableness of attorneys' fees awarded pursuant to contractual fee-shifting provisions); see also Restatement (Second) of Conflict of Laws § 187(1) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."). Indeed, it would make little sense for Delaware law to dictate the meaning of "prevailing party" in Section 14.07 of the BGN LLC Agreement

(providing for an award of "reasonable attorneys' fees"); SIGA
Techs., 67 A.3d at 353 ("[I]n fee shifting cases, a judge [must]
determine whether the fees requested are reasonable."). The
plaintiffs argue that Dechert's billing rates and hours of legal
work were reasonable, and that the requested amount of fees is
proportional to the time and effort expended solely on the
plaintiffs' contract claim. Givaudan contends that the fee
application grossly exaggerates the legal work expended on the
contract dispute, and that the fee award should also be reduced
to account for the plaintiffs' failure to prove any damages.

Under Delaware law, "the determination of the appropriate
amount" of a fee award "is a classic matter for the trial court's
discretion." TransPerfect Glob., Inc. v. Pincus, 278 A.3d 630,
653 (Del. 2022). "Moreover, the party seeking attorneys' fees
and expenses bears the burden of establishing the reasonableness
of the amount sought." Glob. Link Logistics, Inc. v. Olympic
Growth Fund III, L.P., No. 4444, 2010 WL 692752, at *1 (Del. Ch.
Feb. 24, 2010). "To assess a fee's reasonableness, [Delaware]
case law directs a judge to consider the factors set forth in

_____

(as the plaintiffs appear to concede), but for some other body
of law to dictate the meaning of "reasonable attorneys' fees"
in the very same fee-shifting provision.

[Rule 1.5(a) of] the Delaware Lawyers' Rules of Professional

Conduct." <u>Mahani</u>, 935 A.2d at 245-46. Those factors include:

> (1) the time and labor required, the novelty and
> difficulty of the questions involved, and the skill
> requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the
> acceptance of the particular employment will preclude
> other employment by the lawyer;
> (3) the fee customarily charged in the locality for
> similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the
> circumstances;
> (6) the nature and length of the professional
> relationship with the client;
> (7) the experience, reputation, and ability of the
> lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

<u>Id.</u> at 246.[6] A court must also consider whether the number of

hours for which a party seeks fees is "excessive, redundant,

duplicative, or otherwise unnecessary." <u>Id.</u> at 247-48.

**A.**

In this case, Givaudan does not dispute the reasonableness

of the discounted hourly rates that Dechert charged for its legal

---

[6] With respect to the second and fifth factors, this litigation
progressed at a leisurely pace, with ample time for the lawyers
to pursue other matters. The case was filed in July 2018 and
only resolved in July 2022, after a bench trial. Thus, factors
two and five do not argue for any enhancement of the hourly
rates sought in this case. Similarly, the plaintiffs' lawyers
billed the plaintiffs regularly at their discounted rates. There
is no indication that a contingency fee was involved or that the
lawyers bore any risk. Accordingly, the eighth factor also does
not support any enhancement of the hourly rates sought to be
recovered.

work and related services. In any event, the average discounted
rates for the attorneys on the plaintiffs' litigation team were
reasonable. The average discounted rates paid for the three
Dechert associates (ranging from $465.97 to $723.39 per hour, as
shown in the charts above), while on the higher end of the
spectrum of rates typically allowed for other large firms in this
district, are not inconsistent with "the fee customarily charged
in the locality."[7] Mahani, 935 A.2d at 246. The same is true of
the average discounted rates paid for the partners on the
plaintiffs' Dechert team, which, as shown in the charts above,
ranged from $897.50 to $1,079.97 per hour.[8]

---

[7] See, e.g., Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC,
No. 17-cv-8987, 2022 WL 413229, at *14 (S.D.N.Y. Feb. 9, 2022)
(finding that associate rates "rang[ing] from $405 to $660" per
hour were "within the spectrum [of] hourly rates approved in
this district" for large law firms); Angelo, Gordon & Co., L.P.
v. MTE Holdings, LLC, No. 20-mc-23, 2021 WL 1353756, at *3
(S.D.N.Y. Apr. 12, 2021) (awarding fees for associates' legal
services at rates of $650 and $625 per hour). The rates that the
plaintiffs paid on average over the course of the litigation
fell within the bounds of reasonableness, even if some were at
the high end of reasonableness.

[8] See, e.g., Angelo, Gordon & Co., 2021 WL 1353756, at *3 (rates
of $1,175 and $1,350 per hour for partners at large law firm,
"though on the higher end, [were] comparable to rates awarded in
this jurisdiction"); Vista Outdoor, Inc. v. Reeves Fam. Tr., No.
16-cv-5766, 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018)
(partner rates of $1,170 and $1,260 per hour were reasonable and
"not excessive in the New York City 'big firm' market"); Themis
Cap. v. Democratic Republic of Congo, No. 09-cv-1652, 2014 WL
4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (noting that "partner
billing rates in excess of $1,000 an hour[] are by now not
uncommon" in complex litigation).

These average discounted rates are also reasonable in view
of "the nature and length of the professional relationship with
the client." Mahani, 935 A.2d at 246. Since 2018, Dechert has
represented Blue Cal and its affiliates against Givaudan in two
state actions, three federal litigations, and one mediation, see
Helm Decl. ¶¶ 21-22, which together involved an array of complex
commercial and intellectual property disputes between players in
a highly technical synthetic-biology industry. Accordingly, the
Dechert attorneys' average rates appropriately reflect the range
of skills and services needed to litigate on behalf of these
plaintiffs across multiple venues and actions. See Mahani, 935
A.2d at 246 (listing "difficulty of the questions involved" and
"the skill[s] requisite to perform the legal service properly"
as factors relevant to reasonableness of a fee). Moreover, the
"experience" and "ability" of the plaintiffs' Dechert team,
which includes two seasoned partners, lend further support to a
finding that Dechert's average hourly rates for attorney
services were reasonable. Id.

However, the average discounted rates charged for the
senior paralegal's services should be reduced. On average, the
senior paralegal billed $280.22 per hour and $310.39 per hour in
Category 2 and Category 3, respectively. Those average rates
exceed the paralegal billing rates "customarily charged in this
locality," Mahani, 935 A.2d at 246, which tend to fall somewhere

22

"between $90 and $125" per hour. Themis Cap., 2014 WL 4379100, at *8 (discussing the "prevailing market rate[]" for paralegal services and collecting cases); see also Vista Outdoor Inc., 2018 WL 3104631, at *7 ("[C]ourts in this District typically award rates not to exceed $200 per hour for paralegals."). The plaintiffs point to no other basis for this unusually high rate other than the senior paralegal's "fifteen years of experience," Helm Decl. ¶ 11, but courts in this jurisdiction have capped the hourly rates for similarly experienced paralegals at $200. See, e.g., Vista Outdoor Inc., 2018 WL 3104631, at *7 (holding that the rates for paralegals "with more than ten years of relevant professional experience should be reduced to $200"). Thus, the paralegal's billing rate is reduced to $200 per hour.

This reduction in the paralegal's hourly rate affects the total amount of discounted fees in Category 2 and Category 3 out of which fees for the contract claim may be awarded. Accordingly, the Court recalculates those totals and uses the adjusted totals in its analysis below. Accounting for the reduced paralegal rate of $200, the total discounted fees in Category 2 and Category 3 are $1,428,360.22 ("Category 2 Adjusted Total") and $203,448.55 ("Category 3 Adjusted Total"), respectively.

### B.

Other considerations require a substantial reduction of the fee award requested in this particular litigation. The plaintiffs

here are entitled to attorneys' fees and costs incurred solely
in connection with their state-law claim against Givaudan for
breaching the BGN LLC Agreement's confidentiality provision. And
in their fee motion, the plaintiffs contend that the requested
award of $675,176.87 represents a "fair and conservative
estimate" of the fees and expenses attributable to litigating
that claim. Pls.' Memo. of Law at 6. But Dechert's method of
billing, which entailed "present[ing] . . . a single monthly
invoice" that did not "explicitly apportion the hours" between
the five actions involving the plaintiffs and Givaudan, Helm
Decl. ¶ 22, seriously obfuscates the amount of hours devoted to
the contract claim and complicates the assessment of whether
those hours were reasonable. The Dechert bills are an extreme
example of block-billing, making it nearly impossible to verify
the amount of time actually spent on litigating the contract
claim, which was only one part of this case -- and the least
complicated part at that. And this case was combined with the
Term Sheet Case for purposes of the bench trial and for pretrial
and posttrial briefing. All of that time was combined with other
litigation in the Dechert bills.

Moreover, even without the benefit of clearer billing
records, it is apparent from context and from the nature of this
litigation that the plaintiffs' proposed apportionments of fees
overstate the time and labor reasonably expended on the contract

24

dispute in this case. It is helpful to recall that liability for
the contract claim depended on showing that some emails were
sent to ▮▮▮▮ in January and February 2018 and that the sending
of those emails violated the BGN LLC Agreement, which was not
disputed for much of the litigation. And the effort to prove
compensatory damages was unsuccessful because the basis for
calculating those damages was completely speculative. For this
effort, the plaintiffs seek over $675,000 in attorneys' fees and
expenses. That amount, if accepted, would constitute a fee award
far in excess of what is justified under the BGN LLC Agreement.

    To calculate its requested amount, Dechert identified
three categories of time entries containing descriptions of work
purportedly pertaining to this case, and then estimated the share
of fees attributable to the contract claim in each of those
categories. The Court addresses each category in turn.

                            **1.**

    Category 1 in the fee application contains time entries for
work performed solely on this litigation, which encompassed the
contract claim and the plaintiffs' trade-secret misappropriation
claims under the DTSA and DUTSA. Dechert estimates that 50% of
the total discounted fees incurred in Category 1, or $110,491.39
out of $220,982.78, should be attributed to the work performed
on the breach of contract cause of action. Helm Decl. ¶ 26; <u>see
id.</u> ¶¶ 27-28. Dechert suggests that this apportionment is

                            25

reasonable because the state and federal trade-secrets claims

had "near-identical elements of proof," and because "the factual

events" underlying all of the plaintiffs' claims "involve[d] the

same unauthorized disclosure of [t]he [p]laintiffs' confidential

information to a third party." Id. ¶ 26.

It is true that the elements of the two trade-secrets

claims overlapped substantially, and the Court appreciates that

both the trade-secrets claims and the contract claim included

common background facts. However, given the nature of the

contract claim and its relative lack of complexity compared to

the trade-secrets claims, the plaintiffs' request for 50% of the

fees in Category 1 is not reasonable. The specific contract

claim in this case was a standard and straightforward claim for

the breach of a confidentiality provision. And to prevail on that

claim, the plaintiffs were not required to prove that Givaudan's

disclosures to ███ contained trade secrets or some other kind

of intellectual property for which state or federal law provides

special protection. Rather, consistent with the text of the BGN

LLC Agreement, all the plaintiffs needed to show was that the

defendant had disclosed certain information to a third party,

and that such information was "confidential" and potentially

"damaging" to Blue Cal or any of its affiliates. See BGN LLC

Agreement, § 12.01(a) (defining "Confidential Information" as

information "in the nature of trade secrets or that otherwise is

confidential, . . . [the] disclosure of which could be damaging to the other Member" or "its Affiliates" (emphasis added)).

Meanwhile, the plaintiffs' trade-secrets claims entailed legal and factual analysis far beyond what was necessary to make the requisite showing in support of the contract claim. Dechert was charged with proving, for example, that certain of Conagen's "techniques [for] optimiz[ing] the research, development, and scale up production efforts" of ███████ and other biological compounds constituted "trade secrets" under federal and Delaware law, a complex task requiring sophisticated legal analysis as well as some proficiency in the biotechnology industry. Compl. ¶¶ 39, 53; see also Bench Trial Order, 2022 WL 2905515, at *7. Indeed, looking only to the portions of the plaintiffs' briefs that concern the elements of liability on each cause of action, it is clear that the bulk of complex legal analysis was devoted to the trade-secrets claims. See, e.g., Pls.' Summary Judgment Opp'n, ECF No. 61, at 12-21; Pls.' Pretrial Findings of Fact & Conclusions of Law, ECF No. 98, at 11-17; Pls.' Posttrial Memorandum, ECF No. 131, at 26-31, 38-39.[9]

---

[9] The plaintiffs acknowledge that they tried and "failed to establish the additional elements necessary for liability related to the trade secret claims," Pls.' Reply, ECF No. 159, at 1 (emphasis added), effectively conceding that those claims required legal work beyond what was required for the contract claim.

The plaintiffs also suggest that their request for 50% of all fees in Category 1 is appropriate because Givaudan "denied liability [on the contract claim] for years, forced the parties to an expensive trial, and then conceded liability." Pls.' Reply at 1. But that statement is not quite accurate. In its September 2020 motion for summary judgment, Givaudan pressed two principal arguments: first, that the plaintiffs failed "to establish a trade secret or misappropriation thereof," requiring summary judgment on the trade-secrets claims; and second, that the plaintiffs had not "adduce[d] competent evidence of damages," warranting dismissal of both the trade-secrets claims and the contract claim. Def.'s Summary Judgment Memo., ECF No. 43-2, at 13, 19. And the plaintiffs' October 2020 response, filed nearly two years before trial, expressly acknowledged that "Givaudan ha[d] not attacked [the] [p]laintiff's liability case on the breach of contract claim." Pls.' Summary Judgment Opp'n at 24. Given the plaintiffs' acknowledgment of Givaudan's decision not to contest contract liability at the summary judgment stage, it is hard to believe that Dechert devoted equal time and effort to the contract claim and the trade-secret claims in the leadup to the bench trial. At the very least, Dechert was spared the need to research and brief the issue of liability on the contract claim in preparing its opposition to summary judgment.

Finally, the plaintiffs' proposed 50-percent apportionment of fees in this action exaggerates the time and work necessary to litigate the issue of contract damages, in comparison to the issue of trade-secrets damages. The plaintiffs did not advance an independent theory of actual damages to support their contract claim, but instead relied on the same "but-for" damages theory developed in connection with the two trade-secrets claims. See, e.g., Pls.' Pretrial Findings of Fact & Conclusions of Law at 14-15, 19 (seeking $11.7 million in total lost profits for trade-secret misappropriation based on a "but-for" damages theory, and similarly requesting contract damages "of $11.7 million[] for the reasons outlined" with respect to the trade-secrets claims); Pls.' Posttrial Memorandum at 43 ("With respect to the amount of damages, the actual loss analysis for misappropriation reflects the expectancy damages for contract breach."). And Dechert also devoted substantial effort to litigating an alternative damages calculation based on a "reasonable royalty," a relatively complex damages theory that the plaintiffs pursued for misappropriation of trade secrets only. See, e.g., Summary Judgment Oral Arg. Tr., ECF No. 89, at 28:2-11 (plaintiffs' counsel stating that "[w]e also have for the trade secrets claim[s] a reasonable royalty claim which is available"); Pls.' Posttrial Memorandum at 35-37, 42-43 (outlining a "reasonable royalty" theory for the trade-secrets claims, and limiting the contract damages analysis

29

to actual loss). The result is a clear imbalance in the time and work reasonably required to litigate contract damages relative to what was needed to litigate trade-secret damages.

In light of all the above, it is not plausible to suggest that Dechert's work on the contract claim comprised half of the total hours billed to this litigation. Accordingly, the plaintiffs' request for 50% of all fees incurred in Category 1 is excessive and unreasonable. To eliminate the excess included in the plaintiffs' fee request, and to ensure that the final fee award fairly reflects the amount of time and labor reasonably expended on the contract dispute in this case, the Court applies an additional 35% reduction to the apportionment of attorneys' fees attributable to the contract claim.[10] The plaintiffs are entitled to 15% of the total discounted fees incurred in Category 1, or **$33,147.42** out of $220,982.78.

---

[10] In adjusting a fee award under Delaware law, "[t]he Court is not required to conduct a line-item review of the fees." Boeing Co. v. Spirit Aerosystems, Inc., No. N14C12055, 2017 WL 6021423, at *3 (Del. Super. Ct. Dec. 5, 2017). And reducing the fee award based on a line-item review would be impractical here, because many of Dechert's Category 1 time entries do not differentiate between work performed on the trade-secrets claims and on the contract claim. See generally Helm Decl., Ex. B, ECF No. 152-2. Thus, it is appropriate to apply a percentage-based reduction as a means of ensuring that the fee award is not excessive.

**2.**

Category 2 in the plaintiffs' fee application contains time entries purportedly describing work that pertained to both this litigation and the Term Sheet Case, which was consolidated with this case for the bench trial. Dechert has estimated that 33% of the total discounted fees paid in Category 2, or $477,449 out of $1,446,815.15, should be attributed to the work performed on the contract claim in this case. Helm Decl. ¶ 31. Dechert contends that this apportionment is reasonable because the work reflected in these time entries was equally divided between three issues: (1) the trade-secrets claims in this action, (2) the contract claim in this action, and (3) "Givaudan's claim against Conagen for the return of [a] $10 million payment" in the Term Sheet Case. See id. ¶ 30.

The plaintiffs have not met their burden of demonstrating that a one-third allocation of the fees incurred in Category 2 is reasonable. To begin, a substantial share of the time entries in Category 2 are far too vague to determine the proportion of hours fairly attributable to this case, as compared to the Term Sheet Case. Many of the entries refer generally to tasks such as "reviewing documents," "editing discovery requests and responses," "case management," "trial preparation," and "post trial briefing," without providing any indication as to how the hours in each entry should be allocated between the Term Sheet

Case and this case, much less the discrete contract claim in this case.[11] Other entries appear to relate solely to the Term Sheet Case, and therefore no portion of those entries could reasonably be attributed to the contract claim in this action.[12] Given these concerns about the time entries in Category 2, it is

---

[11] Only a few examples from Category 2 are needed to illustrate the point. See, e.g., Helm Decl., Ex. C, ECF No. 152-3, at 1-3 (Reilly entries billing 5.4 hours to "[d]raft[ing] discovery requests for New York litigation," 9.10 hours to "[d]rafting and editing discovery requests and responses for federal litigation," and 3.6 hours to "[r]eview of relevant documents and discovery responses"); see also id. at 8 (Reilly entry billing 6.3 hours to "[p]reparation for summary judgment and trial in SDNY litigation"); id. at 10 (Black entries billing 4 hours total to "[c]ase management"); id. at 17 (Black entries billing 3.5 hours, 4 hours, 5.5 hours, and 5 hours to "[t]rial preparation"); id. at 19 (Black entries similarly billing 8 hours, 7.5 hours, 7.5 hours, 9 hours, and 11 hours to "[t]rial preparation," Reilly entry billing 8.1 hours to "[p]reparation for Givaudan SDNY trials," Hsu entries billing 7.7 hours, 5.8 hours, and 11.1 hours to "[t]rial preparation," and Rattle entries billing 7.4 hours, 9 hours, 8 hours, and 13.25 hours to "assist[ing] with trial preparation"); id. at 21 (Black entries billing a total of 15 hours to "[p]ost trial briefing" and 4.5 hours to "revis[ing] post-trial findings").

[12] For example, Category 2 contains multiple entries regarding Dechert's preparation of a "motion for summary judgment." See, e.g., Helm Decl., Ex. C, at 9 (Reilly entries billing 6.9 hours, 11 hours, 8.4 hours, and 9.2 hours to "[d]rafting and editing motion for summary judgment" or something similar, and 10.2 hours to "[p]reparation of and filing motion for summary judgment"); see also id. (Helm entries billing 2.5 hours to "[w]orking on SJ motion for term sheet case" and 1.2 hours to "[w]orking on summary judgment motion"). Presumably, those entries pertain only to the Term Sheet Case, in which Dechert filed a motion for summary judgment on Conagen's behalf. See No. 18-cv-3588, ECF No. 83. Dechert did not prepare any motions for summary judgment in this litigation; instead, Dechert drafted and filed an opposition to Givaudan's summary judgment motion. See ECF No. 61.

unreasonable to attribute one third of the time billed in this category to the contract claim.

The ambiguity in many of the time entries is particularly troublesome because the plaintiffs' proposed fee apportionment risks understating the share of hours fairly attributable to the Term Sheet Case, and therefore overstating the share of hours fairly attributable to this action. Each litigation ultimately centered on a discrete collection of facts: this action principally concerned the 2014 BGN LLC Agreement and Givaudan's alleged January and February 2018 disclosures of Conagen's protected information to ████, while the Term Sheet Case pertained to a September 2016 Term Sheet executed between the parties and Givaudan's subsequent $10 million payment to Conagen. Thus, these cases necessarily required different fact-gathering, factual analysis, and trial preparation.

The Term Sheet Case also required analysis and briefing of multiple legal issues distinct from those at issue in this case. In the Term Sheet Case, Givaudan sought the return of its $10 million payment and other damages under several different legal theories, including breach of contract, promissory estoppel, conversion, and unjust enrichment. See Givaudan Compl., No. 18-cv-3588, ECF No. 1, ¶¶ 31-69. Although the plaintiffs now characterize the Term Sheet Case as a dispute focused "heavily . . . on the breach of contract claim," Helm Decl. ¶ 30, Dechert

33

performed considerable legal work on certain of Givaudan's other
theories all the way through the bench trial. <u>See, e.g.</u>, Pls.'
Posttrial Memorandum at 47-49 (briefing on Givaudan's promissory
estoppel and unjust enrichment claims). Moreover, Givaudan's
breach of contract claim in the Term Sheet Case concerned an
agreement different from the one at issue in this case, and
therefore required different factual and legal analysis.

Given the combined billing for this case and the Term Sheet
Case, and the inability from a review of the time records to
allocate fairly the portion of those combined fees reasonably
attributable to the contract claim, a substantial discount in
the requested fee is required. Moreover, it appears that some of
the Category 2 entries should be attributed solely to the Term
Sheet Case and should not be attributed to the litigation of the
contract claim in this case. On balance, only 5% of the total
discounted fees in Category 2 (based on the Category 2 Adjusted
Total of $1,428,360.22) should be recoverable, or **$71,418.01.**

**3.**

The final category of attorneys' fees is Category 3, which
contains time entries purportedly reflecting work that pertained
to all five actions in which Dechert has represented Blue Cal and
its affiliates against Givaudan. Dechert estimates that 25% of
the total discounted fees incurred in Category 3, or $50,883.59
out of $203,534.37, should be attributed to the work performed

on the contract claim in this case. Helm Decl. ¶ 35. Dechert argues that this fee allocation is reasonable because (1) this litigation and the Term Sheet Case together accounted for 75% of all fees in Category 3, and (2) within that percentage, the hours expended should be divided equally between the contract claim in this action, the trade-secrets claims in this action, and the Term Sheet Case. See id. ¶ 34.

As with the other categories, the plaintiffs have not met their burden of showing that it is reasonable to apportion 25% of the fees incurred in Category 3 to the contract claim in this action. Some of the time entries in Category 3 are overbroad and ambiguous,[13] while many others list disparate tasks for different cases within the same block of time,[14] making it difficult to

---

[13] See, e.g., Helm Decl., Ex. D, ECF No. 152-4, at 1 (Black entry billing 2.5 hours to "[r]eview strategy; prepare for meeting"); see also id. at 3 (Lyons entries billing 2.6 hours to "[e]ngage in tasks in connection with discovery deadline," 2.7 hours to "[a]ssist with discovery related matte[r]s," and 1.1 hours to "[a]ssist with research regarding discovery procedure; draft correspondence to client regarding discovery"; Reilly entry billing 2.5 hours to "[r]eview of relevant documents and preparation of discovery responses"; Helm entry billing 1.5 hours to "[r]eviewing document production from client, drafting responses and emails on doc requests and topics and documents"); id. at 4 (Lyons entries billing 5 hours total to "[d]raft discovery responses"); id. at 5 (Reilly entries billing 2.08 hours to "[r]eview documents for possible production in state and federal litigation," and 3.9 hours to "[r]eviewed client documents for production in state and federal litigation").

[14] See, e.g., Helm Decl., Ex. D, at 1 (Helm entry billing 2 hours to "[r]eview status of stipulation for SDNY action, review all pending deadlines for all litigations, review protocol for

35

disaggregate the hours fairly attributable to this action as compared to the other four Blue Cal cases. Because the two state actions "were stayed pending resolution of the liquidation" of BGN, and because the Liquidation Case did not involve summary judgment motions, a trial, or any of the related coordination and correspondence, Helm Decl. ¶ 34, it is reasonable to accept the plaintiffs' estimate that 75% of the total discounted fees in Category 3 can fairly be allocated to this action and the Term Sheet Case combined. But for the reasons set forth with respect to Category 2, it is neither fair nor reasonable to assume that this 75% (which, when calculated using the Category 3 Adjusted Total of $203,448.55, amounts to $152,586.41) should

---

26f conference and Givaudan motion dates, discuss with clerks; emails with Givaudan counsel and M. Black on settlement, follow-up on mediation status; prepare and send notes to D. Stern for CMC in CA State action"); see also id. at 2 (Helm entry billing 2 hours to "[o]verview of litigation status to team; reviewing deadlines for upcoming cases, review amended CA State complaint and considering response; emails with Givaudan counsel and . . . liquidator background; consider allegations for response in SDNY action on related nature of trade secrets and dissolution procedures"); id. (Helm entry billing 4.5 hours to "[w]orking on revisions for liquidating trust agreement, emails with client and opposing counsel, strategy and consider work product sequence, teleconference with team on discovery, email to client for proposed discovery and discussions with S. Lyons and S. Rattle on same"); id. at 6 (Helm entry billing 3 hours to "[r]eviewing Givaudan reply SJ brief, research on ▓▓▓▓▓▓, working on motion to compel issues, responses to ▓▓▓ and confidentiality orders from J. Koe[l]tl and SDNY," and 2.5 hours to "[r]eviewing LLC Agreement, ▓▓▓ agreement, . . . outline testimony for ▓▓▓ strains and IP, meet & confer with Givaudan, telecon with M. Black and L. Reilly; plan for close of discovery").

be divided equally between the Term Sheet Case, the trade-secrets claims, and the contract claim. Rather, only 5% of this amount should be attributed to litigating the contract claim in this case, or **$7,629.32.**

## C.

The plaintiffs also seek to recover a portion of the nontaxable expenses that Dechert incurred in connection with its representation of the plaintiffs. As the "prevailing party" "with respect to [a] breach" of the BGN LLC Agreement, the plaintiffs are "entitled to . . . expenses incurred" while litigating their contract claim. BGN LLC Agreement, § 14.07. Dechert incurred a combined total of $145,411.57 in nontaxable expenses across all five actions in which it represented Blue Cal and its affiliates against Givaudan, and the plaintiffs now estimate that 25% of those expenses were "devoted to obtaining a favorable judgment" on the contract claim. Helm Decl. ¶ 41. The plaintiffs therefore ask this Court to award $36,352.89 in nontaxable expenses. Id.

To support their request for a 25-percent allocation of Dechert's expenses, the plaintiffs rely on the same reasoning provided with respect to their proposed 25-percent apportionment of attorneys' fees in Category 3, namely that the plaintiffs are entitled to an equal one-third share out of $109,058.68, which represents 75% of the expenses incurred across all five actions. See Helm Decl. ¶¶ 41, 34. For the same reasons explained with

37

respect to the reduction of the fees in Category 3, the Court will reduce the recoverable share of that amount to 5%, or **$5,452.93.**

### D.

Finally, in evaluating the reasonableness of fees and expenses awarded pursuant to a fee-shifting provision, "a court shall consider 'the amount involved and the results obtained.'" Mahani, 935 A.2d at 246 (quoting Del. R. Pro. Conduct 1.5(a)(4)). The Court is mindful that under Delaware law, "a litigant's success in the proceeding is but one factor to be considered in determining the amount of attorney's fees to award, and this factor may be outweighed by the other factors." Sternberg v. Nanticoke Mem'l Hosp., Inc., 62 A.3d 1212, 1221 (Del. 2013). But on balance here, the discrepancy between the amount of contract damages sought and the results obtained is sufficiently drastic to warrant an additional reduction of the fee award, even when all of the other reasonableness factors are considered.

From the outset of this action, the plaintiffs asserted that they were entitled to "significant damages in an amount to be proven at trial" for Givaudan's alleged breach of the BGN LLC Agreement's confidentiality provision. Compl. ¶ 77. Throughout discovery and all the way up to the bench trial, the plaintiffs asserted that they should recover substantial lost profits of $11.7 million, whether for trade-secret misappropriation or for

breach of contract.[15] See, e.g., Pls.' Interrogatory Responses, ECF No. 54-3, at 6-7; see also Pls.' Pretrial Findings of Fact & Conclusions of Law at 19. But in the end, the plaintiffs failed to show that Givaudan's breach of contract caused a compensable injury, and "[a]ll the plaintiffs' damages calculations" proved to be "based on speculation laid upon speculation." Bench Trial Order, 2022 WL 2905515, at *11-12. Given the highly speculative nature of the damages calculations eventually offered in this case, it is fair to doubt the reasonableness of the tremendous amount of time and labor devoted to litigating that issue and pressing it at trial.

The plaintiffs now argue that the "importance of the nominal damages award" should not be "downplay[ed]," because the underlying "finding of wrongdoing" would provide support for the plaintiffs' "unclean hands" defense in a separate litigation and would deter Givaudan from divulging "confidential information in the future." Pls.' Reply at 6. But if a "finding of wrongdoing" and an award of nominal damages would have served the plaintiffs' ends, that fact similarly calls into question the reasonableness of vigorously pursuing a speculative damages theory through the end of the litigation. To account for the discrepancy between

---

[15] After the bench trial, the plaintiffs reduced their estimated damages significantly, to $2,592,000 in lost profits. See Pls.' Posttrial Memorandum at 43.

the amount involved and the results obtained on the plaintiffs'
contract claim against Givaudan, the Court applies a 10-percent
reduction to the attorneys' fees and nontaxable expenses awarded
in connection with that claim.

To summarize, the Court has reduced the requested amounts
of attorneys' fees in Category 1, Category 2, and Category 3 to
$33,147.42, $71,418.01, and $7,629.32, respectively (adding up
to $112,194.75 in fees), and has likewise reduced the requested
amount of nontaxable expenses to $5,452.93. The sum of those
values is $117,647.68, which is in turn reduced by 10% to account
for the discrepancy between the plaintiffs' speculative request
for damages and the results obtained on the contract claim. Thus,
pursuant to Delaware law and the BGN LLC Agreement's fee-shifting
provision, the plaintiffs are entitled to an award of **$105,882.91**
in fees and expenses -- that is, the "reasonable attorneys' fees"
and expenses fairly attributable to litigating the "breach . . .
of th[e] Agreement" in this action. BGN LLC Agreement, § 14.07.[16]

---

[16] If New York law governed the reasonableness inquiry here, the
Court would reach the same result. "Under New York law, when a
contract provides that in the event of litigation the losing
party will pay the attorneys' fees of the prevailing party, the
court will order the losing party to pay whatever amounts have
been expended by the prevailing party, so long as those amounts
are not unreasonable." Themis Cap., 2014 WL 4379100, at *5. In
exercising their "broad discretion" to determine what constitutes
a reasonable fee, courts applying New York law "may consider a
number of factors[,] including the time spent, the difficulties
involved in the matters in which the services were rendered, the
nature of the services, the amount involved, the professional

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion for attorneys' fees and costs is **granted**. The plaintiffs are awarded the reduced sum of **$105,882.91** in attorneys' fees and expenses. The Clerk is respectfully directed to close ECF No. 147.

**SO ORDERED.**

Dated:    **New York, New York**
            **January 31, 2023**

                                      **John G. Koeltl**
                             **United States District Judge**

---

standing of . . . counsel, and the results obtained." Baring Indus., Inc. v. 3 BP Prop. Owner LLC, No. 19-cv-2829, 2022 WL 4560738, at *5 (S.D.N.Y. Sept. 29, 2022). Moreover, prevailing parties are not entitled to attorneys' fees for hours "that are excessive, redundant, or otherwise unnecessary." Themis Cap., 2014 WL 4379100, at *5. These principles, if applicable here, would give this Court the discretion to consider the very same factors discussed in the reasonableness analysis above, and to accord the same relative weight to those factors. Accordingly, the reduced fee award of $105,882.91 would be appropriate under New York law as well.